John DOE, et al., Plaintiffs, Appellants,

v.

Charles W. GAUGHAN, et al.,
Defendants, Appellees.

No. 85–1844.

United States Court of Appeals,
First Circuit.

Argued Sept. 12, 1986.

Decided Dec. 30, 1986.

Roderick MacLeish, Jr. with whom Susan B. Tuchman and Fine & Ambrogne, Boston, Mass., were on brief, for plaintiffs, appellants.

John W. Bishop, Jr., Sp. Asst. Atty. Gen., with whom Maryanne Conway, Dept. of Correction, Boston, Mass., was on brief, for defendants, appellees.

Before CAMPBELL, Chief Judge, and COFFIN and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

This is an appeal from a decision of the district court holding that the confinement, under civil commitment, of the two mentally ill appellants to Bridgewater State Hospital, a facility of the Massachusetts Department of Correction, did not violate their constitutional rights. *Doe by Roe v. Gaughan,* 617 F.Supp. 1477 (D.Mass.1985).

Appellant John Doe, a chronic schizophrenic, presently resides at Bridgewater State Hospital pursuant to a civil commitment by a Massachusetts state court. Appellant Christopher Hansen, diagnosed as manic depressive, was admitted to Bridgewater in May of 1979 and released in December 1979. He was again committed to Bridgewater in August 1980, where he remained until August 1983 when he was transferred from Bridgewater to Medfield State Hospital, a facility of the Massachusetts Department of Mental Health. Currently he is not hospitalized, is married and is employed as a laborer. The defendants are Charles W. Gaughan, the Superintendent of Bridgewater, and Michael V. Fair, the Commissioner of the Massachusetts Department of Correction.

Appellants brought this action under 42 U.S.C. § 1983 (1982), for declaratory and injunctive relief in the United States District Court for the District of Massachusetts. They alleged that the Massachusetts statutory scheme which authorized their confinement at a state correctional facility was incompatible with the due process and equal protection clauses of the fourteenth amendment; and also that the conditions of their confinement there fell beneath due process liberty standards defined by the Supreme Court in *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).[1] After a bench trial

---

**1.** This suit was originally brought as a class action, *see* Fed.R.Civ.P. 23(c). However, the district court did not rule on the motion to certify the class, and the case was not tried as a class action. Appellants did not pursue the issue before this court, and so we treat this appeal as one brought by the original named plaintiffs individually and not as members of a class. *See Pharo v. Smith,* 621 F.2d 656, 664 (5th Cir.1980); *Jackson v. Lynn,* 506 F.2d 233, 236 (D.C.Cir. 1974); *Geraci v. Treuchtlinger,* 487 F.2d 590, 592 (2d Cir.1973). However, were we to reach the question, we do not think that the district court's failure to certify a class was prejudicial to appellants. In cases seeking declaratory or injunctive relief, certification as a class action is not invariably required where the sought after relief can be obtained without class certification. *See Dionne v. Bouley,* 757 F.2d 1344 (1st Cir.1985); *Galvan v. Levine,* 490 F.2d 1255 (2d Cir.1973), *cert. denied,* 417 U.S. 936, 94 S.Ct. 2652, 41 L.Ed.2d 240 (1974). Here, for example, had appellants prevailed on their claim that the Massachusetts statutory scheme, placing civ-

lasting eight days, the district court concluded that appellants' constitutional rights had not been violated. It entered judgment for defendants. This appeal followed.

## FACTUAL BACKGROUND

Bridgewater State Hospital (hereafter "Bridgewater") is the only maximum security facility for mentally ill males in Massachusetts. Bridgewater houses Massachusetts's most disturbed and violently mentally ill men.[2] Bridgewater is administered by the state Department of Correction, and security is provided by correctional officers. The Medical Director of Bridgewater, who is responsible for patient care there, is appointed by the Commissioner of Correction, with the approval of the Commissioner of the Department of Mental Health. Mass.Gen. Laws ch. 125, § 18 (1974). McLean Hospital, a psychiatric teaching facility associated with Harvard University, is retained under contract by the Department of Correction to provide psychiatric and clinical services at Bridgewater.[3] The psychiatric and clinical staff (including psychologists, psychiatrists, and clinical forensic social workers) which administers direct patient therapy is supplied by McLean Hospital. Arrangements have also sometimes been made to bring in outside physicians and psychiatrists on a consulting basis.

No one may be civilly committed to Bridgewater (as contrasted with the state's other institutions for the mentally ill, which are run by the Department of Mental Health) unless a state court specifically finds, beyond a reasonable doubt, that: (1) such person is mentally ill, (2) such person is not a proper subject for commitment to any facility of the department [of mental health], and (3) the failure to retain such person in strict custody would create a likelihood of serious harm.

Mass.Gen.Laws. ch. 123, § 8(b) (1986).[4] Neither the Department of Mental Health nor the Department of Correction has discretionary power on its own, without court order, to transfer patients to Bridgewater from facilities run by either Department.[5]

There are three categories of patients at Bridgewater: (1) patients transferred from Department of Mental Health facilities (pursuant to a chapter 123, section 8 hearing, *supra*), who are not charged with a crime and are not serving criminal sentences (appellants Doe and Hansen are under this category which is referred to as "civilly committed"); (2) patients who are serving criminal sentences in correctional facilities and who are transferred to Bridgewater (pursuant to a chapter 123, section 8 hearing) because of their mental illness; and (3) persons who are charged with a crime and are sent to Bridgewater (pursuant to a chapter 123, section 8 hearing) for a period of court-ordered observation.

Appellants' district court action was based especially upon two claims. Their first claim was that Mass.Gen.Laws ch. 123, §§ 7, 8, authorizing civil commitment

---

illy committed patients in a Department of Correction facility, was unconstitutional, the injunctive relief would have inured to the benefit of all those similarly situated. *Dionne*, 757 F.2d at 1356.

2. Bridgewater State Hospital is part of the Massachusetts Correctional Institute at Bridgewater, which also includes the Addiction Center, the Treatment Center for Sexually Dangerous Persons, and the Southeastern Correctional Center.

3. McLean Hospital provides the staff for all units at Bridgewater (including the units appellants are or were assigned to) except one, the Maximum 1 Unit. Psychiatric and clinical services for this unit are separately provided by Goldberg Associates.

4. Similarly, once a patient does not need the strict security of Bridgewater, he may not continue to be confined to Bridgewater, and has a statutory right to return to a Department of Mental Health facility. *See Bradley v. Commissioner of Mental Health*, 386 Mass. 363, 436 N.E.2d 135 (1982).

5. The Department of Mental Health may temporarily transfer patients to Bridgewater for five days in emergency situations. Mass.Gen.Laws ch. 123, § 13 (1986). A petition for normal commitment under section 8 must be filed within five days. *Id.*

to Bridgewater, violates both the due process and equal protection clauses by confining persons not convicted of a crime to a correctional facility, *i.e.*, one operated by the Department of Correction rather than the Department of Mental Health. The statute authorizing confinement to Bridgewater deprives them of liberty without due process of law, the appellants argued, because confinement in a correctional institution lacks a reasonable relation to the purpose for which they are civilly committed, *i.e.*, restoration of their mental health. They further argued that because the state has no rational reason to confine some civilly committed mental patients to a correctional rather than a mental health facility, the statutes authorizing their commitment to a correctional facility deny them the equal protection of the laws, *i.e.*, treat them unequally in relation to other mentally ill people.

Appellants' second claim attacked the conditions of their confinement at Bridgewater. They asserted that because of overcrowding, understaffing, and lack of staff training, the state has failed to deliver "minimally adequate or reasonable" care, such as is constitutionally mandated under *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).

The district court, sitting without a jury, made comprehensive findings of fact and rulings of law. As to appellants' claims that their statutory commitment to Bridgewater violates due process and equal protection, the court found that civilly committed patients sent to Bridgewater are even more likely to be dangerous and unmanageable than sentenced prisoners who are sent there from the Massachusetts prison system. *Doe by Roe*, 617 F.Supp. at 1479. The district court noted that many civil patients had committed multiple violent criminal acts but had not been convicted of any crime in a criminal procedure. *Id.* The court found that 20 percent of the residents at Bridgewater had taken a human life, and of those patients, more than half were there on the basis of a civil commitment. *Id.*

The court also found that due to the nature of the patient population, Bridgewater has a "correctional ideology" in that it provides strong external controls and that many of the patients actually benefit from the so-called "protective envelope" provided by the correctional officers because the patients fear losing self-control which may result in harm to themselves or others. *Id.* at 1480. Thus the court concluded that the presence of uninformed officers was of therapeutic value and had also helped to provide a "remarkably safe environment given the character of the patients." *Id.*

The court concluded that despite the "correctional ideology," Bridgewater is not a prison because it is more concerned with mental illness and provides a more caring and nurturing environment. *Id.* These findings, together with numerous other findings led the court to the conclusion that the statutory scheme did not violate due process or equal protection standards. *Id.* at 1484–86.

As to appellants' other claim—that as a result of overcrowding, understaffing, and lack of adequate staff training, Bridgewater does not provide minimally adequate treatment and training—the district court also made numerous findings of fact. The court agreed that Bridgewater was crowded and lacked sufficient staff in some areas. It found that in recent years the population of the institution has risen steadily and that the crowding has had a deleterious effect upon Bridgewater's ability to deliver its services. *Id.* at 1480. The court also noted that the reduction in personal space available to each resident, caused by overcrowding, tends to cause increased tension and conflict between residents. As a result, some may withdraw and become even more ill. *Id.* The court found that at present levels Bridgewater is understaffed in several areas, and this, coupled with the increase in population, results in a decrease of staff time available to patients. *Id.* at 1481.

Notwithstanding these deficiences, however, the district court concluded that existing staffing was adequate to provide

Bridgewater patients care at a level sufficient to meet constitutional minimums. The court observed that each of the primary professional disciplines providing services, such as clinical psychiatry, psychology, and social work, has a caseload of less than 16, which permits a professionally credible level of care to be delivered. *Id.* The court also found that the McLean staff which serves Bridgewater is "highly competent." The court noted that "the evidence suggests that no other security institution in the country can match the quality of the Bridgewater staff." *Id.* [6]

As to the claim of lack of proper training, the court noted that the correctional officers, who are responsible for the day-to-day care and custody of the residents, receive the same training that all correctional officers receive. The court found that this training is relevant to their function in maintaining security and order among a dangerous and violent population. The court observed that the officers assigned to Bridgewater receive three additional weeks of on-the-job training during which the officers are assigned to a psychologist and a social worker from McLean who instruct the officers on the clinical aspects of their duties. *Id.*

The court also found that correctional officers at Bridgewater tend to remain on the job longer and are paid more than mental health aides who perform comparable duties in Department of Mental Health facilities. The court found that generally the correctional officers are assigned to regular shifts which enable them, in many cases, to develop long-term relationships which provide beneficial stability to the patients' lives. *Id.*

Finally, the court made findings of fact concerning each appellant and the treatment he received. As to John Doe, the court found that he is extremely mentally ill and is frequently and unpredictably assaultive. *Id.* The court observed that Doe

was institutionalized seven times in Department of Mental Health facilities. The court noted that during these admissions he received extensive attention, including drug and individual therapy. The court concluded that despite this extraordinary treatment at Department of Mental Health facilities, his condition deteriorated steadily to an extremely primitive, regressive, disturbed plateau and that he was in this condition when he was transferred to Bridgewater. *Id.* at 1481–82.

The court concluded that while the circumstances of Doe's confinement at Bridgewater were less than ideal (*i.e.*, he is often confined alone in his room, sometimes by order, sometimes by his own choice because he is unable to cope with the crowded conditions), over all he received a level of care and treatment that was adequate, and on some occasions, extraordinary. The court noted that Doe had received several modalities of treatment including drug therapy, family therapy, dietary analysis, endocrine analysis, hourly behavior analysis, and one-to-one personal interaction with a ward worker, a psychology intern, and certain correctional officers. The court observed that nationally known physicians were brought in on a consulting basis for Doe's drug therapy. *Id.* at 1483.

The court found that appellant's evidence challenging the sufficiency of Doe's treatment merely established that there is professional disagreement over the preferred mode of treatment for Doe. The court concluded that Doe's care and treatment exceeded what many professionals regard as a minimum standard. *Id.*

As to appellant Hansen, the court noted that he is not currently hospitalized, is working, and married. The court found that while at Bridgewater Hansen received more than minimally adequate care, noting that appellant's evidence to the contrary rested upon speculation as to what might

**6.** The district court's statement is supported by testimony of Dr. McGarry who testified to being familiar with at least five different states' programs and to having consulted with both department of mental health and department of corrections officials at similar institutions in various states.

have occurred if he had been treated differently. *Id.* at 1484.

These findings, together with numerous other findings not set out here, led the court to conclude that professional judgment was exercised concerning the care and treatment of patients at Bridgewater, and that judged by the standard laid down by the Supreme Court appellants received treatment and care while at Bridgewater which met constitutional minimums. *See Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (involuntarily committed mentally retarded entitled to safe conditions, freedom from physical restraint, and minimally adequate training to ensure safety and freedom from undue restraint; in determining if state has met its obligation, courts must make certain professional judgment was exercised).

## I. APPELLANTS' CLAIM OF AN UNFAIR AND BIASED TRIAL

Before reviewing the district court's disposition of appellants' constitutional claims, we turn first to appellants' attack upon the fairness and impartiality of the bench trial conducted by the district judge. The substance of their claim is that the judge, by his own deportment and in his evidentiary rulings, made numerous errors with a cumulative effect so prejudicial as to deny appellants a fair trial. The record, they assert, demonstrates overwhelming unfairness to appellants and prejudgment of the case in defendants' favor.

We have carefully reviewed the trial transcript and the exhibits in this case, and we find that while the judge made a few comments at trial which, when taken out of context, might seem to be improper, over all appellants were not prejudiced by the court's rulings, and they received a full and fair trial. While we cannot discuss every matter raised, we now discuss several of these:

■ Appellants claim the judge erroneously refused to allow Danna Mauch, appellants' witness, to give her opinion as to whether alleged inadequacies in Doe's

treatment plan had affected his ability to remain free from seclusion and retain basic self-care skills. Ms. Mauch was permitted to render her opinion concerning the formulation of treatment plans, as she had experience in this area. However, while Ms. Mauch has experience in the administration of various mental health facilities, she is not a physician, psychiatrist, or doctor of psychology.

The court's ruling that Ms. Mauch was not qualified to render a medical opinion because she is not a physician or psychiatrist was a reasonable ruling that fell within the court's discretionary authority to pass upon the qualification of experts. Questions concerning the adequacy of Doe's treatment and the effect on Doe of any inadequacies were consistently viewed throughout the trial as subjects for professional medical opinion. Appellants' other expert witness, a Dr. Kenneth Tardiff, who is a board certified psychiatrist, was allowed to testify at length on the question of whether there were inadequacies in Doe's treatment plan which affected his ability to remain free from seclusion and retain basic self-care skills. Thus testimony of this nature was presented to the court for its consideration.

■ Appellants also complain that the court did not allow them to present a Dr. Loeffelholz as an expert witness. Defendants point out, however, that it was not until the fifth day of trial that appellants first advised defendants' counsel of their desire to call Dr. Loeffelholz as an expert. Defendants objected on the grounds of unfair surprise and prejudice. The issue was not presented to the judge until the end of the sixth day of trial. The court held that the witness could testify as to factual information, but not as an expert witness because of the lateness of appellants' announcing that he was to be called as an expert. Appellants chose not to call him as a witness at all. We believe the court's ruling was well within its discretion. *See Lirette v. Popich Brothers Water Transport, Inc.,* 660 F.2d 142 (5th Cir.1981) (trial judge's decision to exclude testimony of

witness not listed on pretrial order not an abuse of discretion).

■ Appellants object to the judge's refusal to allow them to ask a witness, Dr. Dahlben, about Doe's smearing and throwing of food and feces. This evidence was allegedly relevant to allegations that Doe had regressed, and that his self-care skills had deteriorated. Appellants complain that the judge would not allow this evidence, stating: "Change the topic. I don't want to hear about this particular topic any longer."

A review of the record shows that this witness had already testified at length about Doe's propensity to smear feces about his room. Moreover, three other witnesses testified concerning Doe's behavior of smearing feces. The judge's belief that the subject had been adequately covered was plainly reasonable. A judge has authority to exclude redundant testimony and keep a trial on track.

■ Another complaint is that when appellants' counsel asked Dr. McGarry, an expert witness for defendants, a question concerning current professional standards, and when Dr. McGarry responded that he did not know how to answer the question, the court stated: "Don't bother answering. Next question."

Review of the record shows that the initial question propounded by appellants' attorney was vague and unclear. This was followed with what can be best described as bickering between the attorney and the witness as to what the original question meant, at which time the judge made his comment. Immediately after the judge's comment, appellants' attorney rephrased the question, and Dr. McGarry answered it.

We are satisfied that the court's rulings were within the discretion accorded a trial judge. The conduct of the trial was proper and, while a few of the judge's remarks may have been phrased in a less than tactful manner, they do not either separately or collectively, when read in context, warrant an inference of bias or unfairness.

## II. CONSTITUTIONALITY OF THE MASSACHUSETTS STATUTORY SCHEME ALLOWING CONFINEMENT AT BRIDGEWATER

■ We turn now to the merits of appellants' constitutional challenges. Because of the nature of the case, we have reviewed the record carefully. We emphasize, however, that we may disturb the *factual* assessments of the lower court only insofar as they are clearly erroneous. Fed.R. Civ.P. 52(a); *Holmes v. Bateson,* 583 F.2d 542, 552 (1st Cir.1978). For us to determine that factual findings are "clearly erroneous," we must, in the words of the Supreme Court, be "left with the definite and firm conviction that a mistake has been committed." *United States v. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). We come away with no such conviction here.

We recognize that the level of care at Bridgewater can be a matter of legitimate and deeply felt differences. The questions before us, however, as before the district court, relate to whether Bridgewater violates constitutional minimums, not whether there are optimally different or better ways of doing things. These latter questions are for the Massachusetts legislature and executive, not the federal courts.

Appellants contend that the Massachusetts laws authorizing the sending of civilly committed mental patients like themselves to Bridgewater deprive them of liberty without due process of law. The fourteenth amendment forbids a state from depriving "any person of life, liberty or property, without due process of law." The statutes to which appellants take particular exception are Mass.Gen.Laws ch. 123, §§ 7, 8. As noted, *supra,* these provide for civil commitment at Bridgewater of mentally ill men whom a state court finds are not proper subjects for commitment to a facility of the state Department of Mental Health and who, the court also finds, create a likelihood of serious harm if not retained in strict custody. It is not claimed that either appellant here was not mentally ill, was not

violent, or did not need a secure facility for his own and others' protection.

Appellants rely upon *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), as establishing that "due process requires that the nature and duration of confinement bear some reasonable relation to the purpose for which the individual is committed." *Id.* at 738, 92 S.Ct. at 1858. Appellants claim that the purported "correctional" nature of their confinement bears no relation to the only legitimate goal of their confinement: that goal, according to appellants, must be the restoration of their mental health, thus facilitating their early return to the community. Appellants argue that there is no rational reason to inflict upon them "the torment of a penal institution" simply because of the severity of their illness.

However, appellants overlook the fact that, even apart from any possible benefit to the patient, a state has an obvious and legitimate interest in confining a violent mentally ill person so as to prevent harm to others. *See Santana v. Collazo,* 714 F.2d 1172, 1176 (1st Cir.1983). Hence, when a state places persons with appellants' violent proclivities in a secure facility, it does not necessarily follow that the state wishes to "punish" them. The very language of the challenged statutes indicates that Massachusetts' object in confining appellants to Bridgewater was to provide a high security environment for men with a potential for doing serious harm—men whom it cannot control in less secure institutions run by the Department of Mental Health. The district court's supported finding that many civilly committed Bridgewater patients had committed crimes, including homicide, underscores society's need to secure such persons. Since an incompetent person may not be capable of standing trial, or if tried, may be found not guilty by reason of insanity, it is obvious that the civil commitment label does not mean that such an individual may not be equally or more dangerous than many criminals.

Apart from public safety, moreover, there was evidence produced at trial, and the district court found, that violent mental patients themselves benefit from the "protective envelope" of the strict security provided by correctional officers because these patients fear losing control. *Doe by Roe,* 617 F.Supp. at 1480. The testimony of Dr. Robert Fein demonstrated the therapeutic value of providing strict security for these patients:

> Bridgewater State Hospital has much clearer external controls, that is, the message given to patients explicitly and implicitly is: You have been unable to control yourself in another setting or in another facility and we will demonstrate to you that you don't have to be worried about that. If you cannot control yourself, the facility will control you.
>
> So that there are clear locks and doors. There are uniformed correctional officers. The message is: You can be controlled here, therefore, you don't have to worry about losing control.
>
> The Department of Mental Health facilities in my experience do not have that same attention to control....

Thus the nature and duration of appellants' confinement to Bridgewater, a high security facility, clearly bears some reasonable relationship both to the state's public safety needs and to the patients' own therapeutic interests in a secure environment.

■ Appellants argue, however, that civilly committed persons, even if violent and in need of security, are entitled to more than "punishment" at a "penal institution." Conceivably, although we do not rule on the question, if Bridgewater were truly indistinguishable from a penitentiary, the mere fact that it prevented patients from doing harm would be insufficient, constitutionally, to justify incarceration there. But there is substantial evidence that, although Bridgewater has been placed administratively under the state Department of Correction, it is not a mere prison but, in fact, is administered so as to provide treatment rather than punishment within the limitations of a high security setting. The district court supportably found that Bridgewater "differs from a correctional institu-

tion in that it is more concerned with mental illness and provides a more caring and nurturing environment." 617 F.Supp. at 1480.

Appellants rely upon the holding in *Lynch v. Baxley*, 744 F.2d 1452 (11th Cir. 1984), that Alabama's practice of detaining persons awaiting involuntary commitment proceedings in county jails violated due process. But appellants are not being housed in a jail, nor, it may be added, are they just a cross-section of the population of people needing civil commitment, as was apparently true in *Lynch*. In *Lynch*, mentally ill persons were held in local county jails sometimes for periods longer than 30 days pending a commitment hearing. None of the county jails employed trained mental health professionals, and many of the county jails provided no routine medical care.[7] The court held that "jail" is for the incarceration of criminals, and so persons who were only awaiting involuntary commitment proceedings could not be "punished" by being detained in jails. *Id.* at 1461. To so punish persons awaiting involuntary commitment did not bear any relation to the purpose of their confinement.

We have no quarrel with the Eleventh Circuit's reasoning. Bridgewater, however, has a medical director and extensive psychiatric programs; its inmate population is limited to persons specially committed based on findings of extreme dangerousness and unsuitability for conventional mental health settings; it is more akin to a hospital, albeit a high security hospital.[8] Appellants are not placed in Bridgewater for punishment but for therapeutic as well as public safety purposes.[9]

---

7. The court in *Lynch* described conditions in Alabama's county jails:

> Overcrowding is a continuing problem because the state keeps a large number of its prisoners in county jails.... The county jails in almost if not all areas fall below the minimum constitutional standards set forth in *Pugh v. Locke*, 406 F.Supp. 318 (1976).... Safety conditions in the jails are substandard. Almost all of the county jails inspected by the State Fire Marshal had serious fire hazards.... Of the forty-seven jails with extreme fire hazards, four detained mentally ill persons awaiting hearings for over thirty days. Sixty-seven of seventy jails inspected by the Board of Corrections were found to be unsanitary and in a state of disrepair. Seven of the county jails have been declared unfit to house any human beings. In two of those counties, emergency detainees have been held for longer than the thirty days provided for in [the statute].... Approximately two-thirds of the county jails fail to provide close to sixty square feet of living space per prisoner. Sixty-three of the sixty-seven county jails have no exercise or recreational facilities.

*Lynch*, 744 F.2d at 1460–61.

8. Nor do we think that the case of *Kesselbrenner v. Anonymous*, 33 N.Y.2d 161, 350 N.Y.S.2d 889, 305 N.E.2d 903 (1973), supports reversal. In *Kesselbrenner*, the court of appeals pointed out that the primary purpose of the correctional facility in question was to hold in custody "such mentally ill persons held under any other than a civil process as may be committed to the department [of Correction] by courts of criminal jurisdiction." *Id.* at 893, 305 N.E.2d at 906. The court noted that the facility had been allowed to falter and "drift into decline as a pioneer mental hospital and into constantly improved status as a security institution." *Id.*

9. The Supreme Court has recognized, in the context of pretrial detainees, that often restrictions on freedom may resemble punishment, but that mere resemblance does not equate to an unconstitutionally inflicted punishment. In *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Court observed:

> Not every disability imposed during pretrial detention amounts to "punishment" in the constitutional sense, however. Once the Government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention. Traditionally, this has meant confinement in a facility which, no matter how modern or how antiquated, results in restricting the movement of a detainee in a manner in which he would not be restricted if he simply were free to walk the streets pending trial. Whether it be called jail, a prison, or a custodial center, the purpose of the facility is to detain. Loss of freedom of choice and privacy are inherent incidents of confinement in such a facility. And the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into "punishment".... Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condi-

There was credible testimony before the district court, by Dr. Louis McGarry, that the psychiatric program supplied by McLean Hospital to Bridgewater was outstanding and that there is "no other institution of Bridgewater's type [department of mental health or correction, *see* note 6, *supra* ] in the country that approaches the quality of that staff." Bridgewater provides education and vocational programs including special education programs for patients with learning disabilities. Patients can participate in college courses offered at Bridgewater through Massasoit Community College. Bridgewater employs a full-time artist to work with patients, and there are a number of recreational activities.

That Bridgewater is denominated a "correctional facility," run by the Department of Correction, does not make Bridgewater into a prison. Contrary to appellants' assertions, there was very little evidence of infliction of the "torment of a penal institution." [10] Instead, based on the statutory arrangements, the lower court's findings and the evidence presented, we conclude that the nature and duration of appellants' commitment to Bridgewater are reasonably related to the purpose of their confinement. Massachusetts has created a careful statutory framework for treating dangerously violent mental patients. There was substantial evidence that the nature of confinement at Bridgewater is therapeutic and not penal. Thus the nature of their confine-

ment, at a strict security but therapeutic facility, is reasonably related to the purpose of controlling and stabilizing these violent mental patients so that they may be returned, when ready, to the less security conscious Department of Mental Health facilities.

As to the duration of this specialized confinement, we note that the initial commitment pursuant to chapter 123, section 8, is for six months. All subsequent commitments are for one-year periods, and patients who no longer require the strict security of Bridgewater have a statutory right to return to a Department of Mental Health facility. We find that the nature and duration of the confinement of violently mentally ill men at Bridgewater is reasonably related to the purpose of their confinement and therefore does not violate appellants' due process rights under *Jackson v. Indiana.*

■ Appellants also claim that the Massachusetts statutory scheme under which severely mentally ill patients may be confined in a correctional facility violates the fourteenth amendment in that it denies them "the equal protection of the laws." To uphold appellants' equal protection claim, we would have to find that the laws authorizing their commitment to Bridgewater rather than to the facilities run by the state Department of Mental Health are irrational and arbitrary. It is well established that a statutory scheme such as ap-

---

tion is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.
*Id.* at 537–39, 99 S.Ct. at 1873–74.
The same reasoning may be applied to the confinement of dangerously mentally ill men at a strict security facility such as Bridgewater.

**10.** While it is true that appellant Doe was the victim of abuse at the hands of correctional officers, the district court found that these were isolated incidents. 617 F.Supp. at 1482–83. One time a correctional officer entered Doe's room and taunted him with a plastic whiffle ball bat while he was in restraints on his bed. The Department of Correction immediately in-

vestigated the incident, and the entire shift of correctional officers who were on duty at the time was transferred out of the unit.
On another occasion, correctional officers called Mr. Doe by his first name, even though they knew this conduct would infuriate him. Again this incident was promptly investigated. While these isolated incidents were clearly inappropriate, they do not amount to an "infliction of the torment of a penal institution."
Moreover, such isolated incidents do not necessarily give rise to a constitutional violation such as is alleged here. *See Society for Good Will to Retarded Children v. Cuomo,* 737 F.2d 1239, 1245 (2d Cir.1984) (isolated incidents of inadequate care, or even malpractice do not demonstrate a constitutional violation of the rights of mentally retarded residents at a state school).

pellants here challenge does not deny equal protection of the laws so long as it can be said to be rationally related to a legitimate governmental purpose. *See, e.g., City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 105 S.Ct. 3249, 3254–55, 87 L.Ed.2d 313 (1985) (legislative classifications based upon mental retardation are presumed to be valid and will survive an equal protection challenge if rational).

The statutory framework at issue in this case provides for confinement at Bridgewater of only mentally ill men who are violent and therefore in need of strict security such as Bridgewater alone provides. It is clear, under Massachusetts law, that when a patient's need for strict security ceases, he has a right to be transferred to a Department of Mental Health facility. *See Bradley v. Commissioner of Mental Health*, 386 Mass. 363, 436 N.E.2d 135 (1982).

As we have already noted, it is a legitimate activity of government to confine dangerous individuals for society's protection. *See Santana v. Collazo*, 714 F.2d 1172, 1176 (1st Cir.1983). This is so apart from any consideration of benefit to the patient. Here, however, as discussed *supra*, there is also evidence of some patient benefit since violent mental patients fear losing control. There is also evidence, as noted *supra*, that Bridgewater conducts major mental health programs within its high security setting, and is not a penal institution as such.

That the state has designated the Department of Correction to operate such a high security facility does not deny appellants equal protection of the law. For constitutional purposes, the question is not whether the courts think it better or worse that such a facility be run by the Department of Correction rather than of Mental Health, but whether Massachusetts could rationally choose to do the former. We think so. A state could reasonably believe that its department of correction was better equipped and more experienced in the maintenance of a secure facility for extremely violent mentally ill men than is its

department of mental health, and thus is the proper department within state government to provide the strict security setting for these men. We note that Bridgewater deals not only with civilly committed patients who are severely disturbed and violent, but also with sentenced prisoners suffering from mental problems and persons charged with crimes who have been sent there for periods of court-ordered observation. *Supra.* All such persons share a need in common for treatment and observation by mental health professionals within an especially secure setting. The state could reasonably believe that it was more efficient to place all such persons in a single institution rather than creating another, separate, high security institution in the Department of Mental Health for civilly committed persons.

To be sure, it could be considered unreasonable to confine violent but non-criminal mentally ill persons to a facility that was no more than a prison; but the district court found that while Bridgewater is denominated a correctional facility, it has specialized staff and facilities for the mentally ill and is not simply a prison. Given the fact that persons sent to Bridgewater are not just mentally ill, but fall within a special class of persons who are both mentally ill and violent and in fact have behavioral problems beyond the capacity of other institutions to handle, the decision to place them in this special facility designed to contain their violence, and yet also staffed to deal with their mental illnesses, does not violate equal protection principles.

Another ground for appellants' equal protection argument is their contention that transferees to Bridgewater lose certain rights and privileges given to all patients at Department of Mental Health facilities. There is no constitutional requirement, however, that all mental patients in state-run hospitals receive the same rights or care. *See Woe v. Cuomo*, 729 F.2d 96, 103 (2d Cir.1984), *cert. denied*, 469 U.S. 936, 105 S.Ct. 339, 83 L.Ed.2d 274 (1985). Massachusetts has made a sufficient showing here that its distinctions in the privi-

leges accorded patients are related to the severity of their illness, their violent propensities, and the type of treatment they are believed to need.

Many of the privileges provided to the less violent patients in Department of Mental Health facilities may rationally be found to be inappropriate for patients who exhibit the need for strict security. For example, appellants point out that Department of Mental Health patients have the right to have their letters forwarded unopened to the Governor, Commissioner, personal physicians, attorneys, clergymen, or any court. Mass.Regs.Code tit. 104, § 3.10(7)(b) (1983). Other letters may be opened, or the forwarding of their letters may be restricted "when in the person's best interest." *Id.* A Bridgewater patient's mail cannot be opened if it is addressed to the Governor, any member of the federal or state legislature, the United States or state attorney general, the FBI, or the Massachusetts Department of Public Safety, the superintendent of the correctional facility, the parole board, the Secretary of Human Services, or the Governor's Advisory Committee on Correction, and if the patient's name and return address is included on the outside of the envelope. 103 B.W.T. § 481.14 (1984). All other incoming or outgoing mail may be opened for "reasons of safety or security." *Id.* Thus mailing privileges are analogous, but they are restricted for Bridgewater patients for security reasons.

Further examples include that Department of Mental Health patients have the right to be visited "at all reasonable times." Mass.Regs.Code tit. 104, § 3.10(c), (d). There are some specific limits on visits for Bridgewater patients, such as that there can be no more than three visitors at a time. 103 B.W.T. § 483. We cannot say such restrictions are not rationally related to security needs.

Department of Mental Health patients have the right to wear their own clothes, and to keep and use their own personal possessions. Mass.Regs.Code tit. 104, § 3.10(7)(e). Bridgewater patients are permitted freedoms in personal grooming as long as their appearance does not conflict with the institution's requirements for safety, security, identification, and hygiene. 103 B.W.T. § 400.09.

Department of Mental Health patients have the right to keep and spend a reasonable sum of their own money. Mass.Regs. Code tit. 104, § 3.10(7)(e). Bridgewater patients' money is received and processed in accordance with certain procedures as established in 103 B.W.T. § 405.11.

Department of Mental Health patients have the right to easy access to their individual storage space for private use. Mass.Regs.Code tit. 3.10(7)(e). Bridgewater must maintain a secure private property storage area, but a property officer is the only person with the keys to this area. 103 B.W.T. § 403.07. A comparison of these personal rights shows that Bridgewater patients have analogous rights to Department of Mental Health patients' rights, but those rights are curtailed or limited for security reasons. Given that Bridgewater patients are more seriously ill and more dangerous than patients at other mental health facilities, and considering also that Bridgewater patients have different therapeutic needs than patients at other facilities, these distinctions are rational, hence constitutionally supportable.

It is true that certain other rights are statutorily guaranteed to Department of Mental Health patients but are not explicitly guaranteed to Bridgewater patients. For example, Department of Mental Health facilities must, by state law, provide "the highest practicable professional standards for the reception, examination, treatment, restraint, transfer and discharge of mentally ill [persons]." Mass.Gen.Laws ch. 123, § 2 (1986). A Department of Mental Health patient is to "receive such medical, vocational, social and rehabilitative services as his age, condition and abilities require to bring about an early return to his community." Mass.Regs.Code tit. 3.10(3). These statutes do not cover persons once they have been civilly committed to Bridgewater. Correction regulations do provide, however, that it is Bridgewater's policy to

afford each Bridgewater patient "necessary psychiatric and medical treatment." 103 B.W.T./SH. And psychiatric and medical treatment are in fact provided at Bridgewater.

We think the legislature's failure to spell out the patients' rights at Bridgewater is regrettable but not violative of the equal protection clause. The evidence is clear that one of the goals of Bridgewater is to stabilize patients who are out of control so that they can return to a Department of Mental Health facility to continue their progress towards mental health. Given the severity of their illnesses, the policy of providing them with mental health care at Bridgewater, and the fact that they are to be returned to mental health facilities when they no longer need Bridgewater's security, the absence of express statutory rights does not by itself violate equal protection standards.

The equal protection clause, as we have said, does not require that all mental patients be treated exactly the same. *See Woe v. Cuomo,* 729 F.2d at 103. When a state decides to confer a benefit upon a segment of its population, it may decline to provide the exact same level of benefits to another segment, so long as its decision is rational. *See Schweiker v. Hogan,* 457 U.S. 569, 590, 102 S.Ct. 2597, 2609, 73 L.Ed.2d 227 (1981) (legislative classifications that result from the conclusion that public assistance programs cannot always provide meaningful benefits in equal measure to everyone do not violate equal protection, as long as rational); *Dandridge v. Williams,* 397 U.S. 471, 487, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970) (equal protection does not require states to choose between attacking every aspect of a problem or not attacking the problem at all).

Given that security and control, in addition to patient therapy, is the appropriate primary focus in the case of persons committed to Bridgewater, while returning patients to the community is the primary focus at mental health facilities, it is not irrational for the state to expend more of its limited resources on stabilizing and controlling these violent patients, and perhaps somewhat less of its resources on the usual psychiatric approaches. The state might believe that if, in addition to the cost of the high security that Bridgewater patients require, it must also guarantee to provide "the highest practicable professional standards" (which patients who do not need high security are statutorily mandated to receive), the cost of treating Bridgewater patients would become prohibitive.

Of course, the fact that Bridgewater patients need greater security would not be a valid reason to deny them any psychiatric care at all. However, as discussed *infra,* the defendants have shown that patients at Bridgewater receive a constitutionally adequate level of psychiatric care. Since Bridgewater patients receive adequate care which appropriately focuses on security and control, the fact that they are not statutorily guaranteed the exact same level of psychiatric care as patients who are not in need of strict security does not offend equal protection.

The rationality of the statutory scheme is further bolstered by the fact that Bridgewater is part of a larger facility which also includes the Addiction Center and the Treatment Center for Sexually Dangerous Persons. *See* footnote 2, *supra.* The state has created a hybrid facility which serves a special population requiring high security together with some kind of additional treatment, be it addiction therapy or psychiatric care. Thus contrary to appellants' assertions, the state has not arbitrarily decided to deny mental patients at Bridgewater the benefits provided Department of Mental Health patients, but rather the state has established a separate facility, with different rules and privileges, designed to meet the special needs of this special population. We cannot say that the state's method of providing for this unique population is irrational.[11] The classifications of mentally ill

11. The statutory framework requires a state court to find, beyond a reasonable doubt, that a patient needs the strict security provided by Bridgewater before that patient may be transfer-

men resulting from the Massachusetts statutory scheme are rationally related to legitimate governmental goals and so do not violate equal protection.

## III. CONSTITUTIONAL RIGHT TO TREATMENT

■ Appellants assert that the conditions of their confinement at Bridgewater violate their due process rights under the fourteenth amendment by confining them in unsafe conditions, unduly restraining their freedom of movement, and by not providing them with the level of training necessary to protect their liberty interests in personal security and freedom from restraint. These rights were identified by the Supreme Court in *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), wherein the Court found that involuntarily committed mentally retarded persons enjoy the right, under the due process clause, to safe conditions of confinement, *id.* at 315–16, 102 S.Ct. at 2457–58 the right to freedom from unnecessary bodily restraint, *id.* at 316, 102 S.Ct. at 2458, and the right to such minimally adequate treatment and training as is reasonably necessary to protect those interests. *Id.* at 319, 102 S.Ct. at 2459. Whether a patient's constitutional rights have been violated necessarily depends upon a balancing of his liberty interests against relevant state interests. *Id.* at 321, 102 S.Ct. at 2461. The Court noted that to ensure uniformity in protecting these various interests, the balancing should not be left to the unguided discretion of the courts. *Id.* Accordingly, the Court established a deferential standard, holding that

"the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." *Id.* (quoting from Chief Judge Seitz's concurrence in the lower court opinion, 644 F.2d 147, 178 (3d Cir.1980)).

· The Supreme Court emphasized that treatment and training decisions, if made by a professional [12] are presumptively valid. *Id.* 457 U.S. at 323, 102 S.Ct. at 2462. Liability (or as in our case, injunctive relief) may be "imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* (footnote omitted). The Court made clear that, by adopting a deferential standard, the federal judiciary's interference with the internal operations of state institutions would be minimized. *Id.* at 322, 102 S.Ct. at 2461.

In the present case the district court found, as to the issue of appellants' safety, that Bridgewater is a safe institution and is more safe than one would expect. 617 F.Supp. at 1480. There was testimony before the court that Bridgewater's civil patients are more likely to be dangerous and unmanageable than those serving criminal sentences; that many civilly committed patients have committed multiple violent criminal acts but have not been convicted of a crime; and that 20 percent of the residents at Bridgewater have taken hu-

red. *See supra.* This requirement ensures that no mental patient will unnecessarily be subjected to the treatment program at Bridgewater which appropriately focuses on control and security. Thus the state's rigorous classification scheme protects against arbitrary transfers to Bridgewater and any attendant loss of personal freedoms.

12. The Court articulated what it meant by the term professional:

By "professional" decisionmaker, we mean a person competent, whether by education, training or experience, to make the particular

decision at issue. Long-term treatment decisions normally should be made by persons with degrees in medicine or nursing, or with appropriate training in areas such as psychology, physical therapy, or the care and training of the retarded. Of course, day-to-day decisions regarding care—including decisions that must be made without delay—necessarily will be made in many instances by employees without formal training but who are subject to the supervision of qualified persons. *Youngberg v. Romeo,* 457 U.S. at 323 n. 30, 102 S.Ct. at 2462 n. 30.

man life and of that 20 percent, more than half are civilly committed patients. Despite the violent nature of patients at Bridgewater, in the last eight years there have been no murders, and six suicides. The district court's finding that Bridgewater is safe, is supported by the evidence and is not clearly erroneous.

As to appellants' claim that defendants have unduly restrained their freedom of movement, the district court found that restraints and seclusion are only used after approval by a member of the professional staff. 617 F.Supp. at 1482. Correctional officers may reduce the degree of restraint when no longer necessary. Thus, the court held that the use of restraint and seclusion is based upon the exercise of professional judgment and that appellants have suffered no constitutional violation of their right to freedom from restraint.[13] *Id.* We find that the district court's holding was not clearly erroneous and must be affirmed.

Appellants assert that Bridgewater failed to provide them with adequate care, treatment and training so as to reduce their time spent in restraint and seclusion. They base their allegations, in part, upon overcrowding and lack of proper staffing at the institution. The district court found that there was overcrowding and accepted that conditions at Bridgewater are far less than ideal. It concluded, however, that there was a constitutionally sufficient level of treatment. *Id.* at 1481.

Overcrowding, apparently a chronic problem in such institutions, does not without more constitute a constitutional violation. The Supreme Court in *Youngberg* recognized this problem when it established the

deferential standard that is to be applied in these cases. "In determining whether the State has met its obligations in these respects, decisions made by the appropriate professional are entitled to a presumption of correctness. Such presumption is necessary to enable institutions of this type—often, unfortunately, overcrowded and understaffed—to continue to function." *Youngberg,* 457 U.S. at 324, 102 S.Ct. at 2462–63.

In the present case, the district court found that while overcrowding and the lack of staffing in some of the professional positions was making treatment more difficult, nevertheless the professional staff was still able to exercise its professional judgment and provide adequate treatment to Bridgewater patients. We cannot say that the district court erred in finding that both appellants received adequate treatment which resulted from the exercise of professional judgment. In Mr. Doe's case, as the court noted, standard modalities of treatment as well as a few innovative treatment techniques were tried, and nationally known psychiatric experts were called in for consultations. The defendants' experts provided substantial support for the court's conclusions.

Appellants presented evidence of other types of treatment which *might* prove helpful in lessening the length of time Mr. Doe spends in restraints or seclusion. However, we agree with the court's observation that "the plaintiff has succeeded only in proving that professional opinion differs as to which modalities are appropriate and which are not. This does not establish a constitutional deprivation."[14] 617 F.Supp. at 1487. The court went on to conclude

In so ruling, I am cognizant of the fact that Bridgewater is both crowded and

---

**13.** The Supreme Court in *Youngberg* clearly accepted the inevitable need for some use of restraints:

In operating an institution such as Pennhurst, there are occasions in which it is necessary for the State to restrain the movement of residents—for example, to protect them as well as others from violence.

*Youngberg,* 457 U.S. at 320, 102 S.Ct. at 2460.

**14.** As to appellant Hansen, the evidence also supports a finding that he received adequate treatment while at Bridgewater. Appellants

presented expert witnesses who testified that he did not receive minimally adequate care. Appellees, however, presented experts who testified that Hansen did receive adequate care. The district court was in a position to assess the credibility of this conflicting testimony, and we are unable to say that its finding was clearly erroneous. *See Oxford Shipping Co. v. New Hampshire Trading Corp.,* 697 F.2d 1, 5 (1st Cir.1982) (assessments of credibility are within the province of district court and will not be

understaffed in some areas. This makes for less than ideal conditions which may impact negatively on some patients. In the case of John Doe, for example, the increased activity within the [medical unit] causes him to spend more time in his room. This, however, is a result of his most unfortunate and devastating mental illness as much as it is a short-coming of the facility. The Constitution does not require a state to provide an ideal environment for each person in its mental institution. Rather, it must provide an environment in which professional judgment may be exercised. Because Bridgewater's facilities are not so lacking as to prevent this exercise of professional judgment, these shortcomings do not rise to the level of a constitutional deprivation.

*Id.* at 1487–88.

On this record, we must affirm as not being clearly erroneous the district court's findings that appellants are being confined to a safe institution wherein restraints on freedom of movement and the treatment and training provided so as to lessen the amount of time in restraint are the result of the exercise of professional judgment.[15]

*Affirmed.*

overturned absent a compelling showing of error).

15. Appellants also claim that defendants failed to provide appropriate training and treatment so as to prevent further deterioration of John Doe's mental health. The constitutional right to such training has never been established by the Supreme Court. However, Justice Blackmun's concurrence in *Youngberg* (joined by Justices O'Connor and Brennan), suggested that a state may be required to provide training necessary to preserve the self-care skills (such as dressing and toileting) that the involuntarily committed person possessed when he entered the facility. *Youngberg,* 457 U.S. at 327–29, 102 S.Ct. at 2464–65 (Blackmun, J., concurring). *See also Society for Good Will to Retarded Children, Inc.,* 737 F.2d 1239, 1250 (2d Cir.1984) (accepting Justice Blackmun's suggestion "that an individual has a due process right to training sufficient to prevent basic self-care skills from deteriorating").

We note, however, that in the present case there was expert evidence before the district

court that the normal course of chronic schizophrenia is a continual deterioration. The district court found that during Doe's seven prior admissions to Department of Mental Health facilities he received extensive treatment, including individual therapy, but, nevertheless his condition deteriorated steadily to an extremely primitive, regressive, disturbed plateau. He was in this regressive condition when he arrived at Bridgewater. 617 F.Supp. at 1482. The court further found that "[g]iven Doe's deteriorating condition over the previous fourteen years and that many methods of treatment have proven unsuccessful, [his treatment plan] realistically focuses on Doe's primitive level of functioning." *Id.* at 1483.

Thus, any claimed loss of pre-existing self-care skills was a result of the course of his devastating mental illness. Therefore, assuming that a constitutional right to such training exists (although we do not now decide that question), we find that appellants have not proven that it is the treatment program at Bridgewater which has caused the loss of any claimed pre-existing self-care skills.