**Robert E. CAMERON, Plaintiff,**

v.

**Henry TOMES, in his capacity as Commissioner of the Department of Mental Health, and James P. Sansouchi, in his capacity as Administrator of the Massachusetts Treatment Center, Defendants.**

**Civ. A. No. 86–3607–K.**

United States District Court,
D. Massachusetts.

Feb. 14, 1992.

Robert Dennis Keefe, David M. Rocchio, Hale & Dorr, Boston, Mass., for plaintiff.

Michelle A. Kaczynski, Atty. General's Office, Civ. Bureau, Elisabeth J. Medvedow, Atty. General's Office, Crim. Bureau, Boston, Mass., for defendants.

## OPINION

KEETON, District Judge.

This action for equitable relief is brought by a patient involuntarily committed to the Massachusetts Treatment Center for the Sexually Dangerous ("Center"). Plaintiff Robert Cameron ("Cameron") alleges that defendants have violated his federal constitutional rights by failing to provide him with minimally adequate treatment. In particular, Cameron contends that defendants persist in rigidly applying the Center's rules and policies to him, despite defendants' actual knowledge that the strict enforcement of those rules and policies interferes with Cameron's ability to respond to treatment. The court conducted a six-day nonjury trial that commenced in November 1991 and ended in January 1992.

### I. Background

On December 13, 1978 Cameron pled guilty in Vermont to charges of rape. He was subsequently extradited to Massachusetts in June of 1979 to plead guilty to a similar crime. In 1983 Cameron was paroled from his Vermont sentence and transferred to Massachusetts to begin serving his Massachusetts sentence at MCI Walpole. On June 29, 1984, Cameron was adjudged a sexually dangerous person based on the fact that he had been convicted of two separate violent sexual assaults. Plaintiff's Exhibit 1. He was committed to the Center on November 14, 1985, as a Sexually Dangerous Person for a term of one day to life, pursuant to Mass.Gen.L. ch. 123A, § 6, as the law then existed.

At the time of trial the Center had a patient population of 232 men, all whom have been adjudged sexually dangerous. Most of these men have underlying criminal convictions. As a result, the Center is operated jointly by the Department of Mental Health and the Department of Correction. Cameron's time at the Center is applied to his criminal sentence. *See Langton v. Johnston*, 928 F.2d 1206, 1210 n. 4 (1st Cir.1991). His criminal sentence expires on February 15, 1992.

## II. Constitutional Rights of the Involuntarily Committed

■ In *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Supreme Court held that involuntarily committed mentally retarded persons enjoy the right, under the due process clause of the fourteenth amendment, to safe conditions of confinement, *id.* at 315–16, 102 S.Ct. at 2458, the right to freedom from unnecessary bodily restraint, *id.* at 316, 102 S.Ct. at 2458, and the right to such minimally adequate treatment and training as is reasonably necessary to protect those interests. *Id.* at 319, 102 S.Ct. at 2460. A patient does not have a constitutional right to an ideal environment or an ideal treatment plan, or even a guarantee that the patient will be cured. *See Doe v. Gaughan*, 808 F.2d 871, 886 (1st Cir.1986) (quoting *Doe by Roe v. Gaughan*, 617 F.Supp. 1477, 1487–88 (D.Mass.1985)); *Ohlinger v. Watson*, 652 F.2d 775, 779 (9th Cir.1980). Rather, the involuntarily committed have the constitutional right

> "to minimally adequate habilitation ... which will *tend* to render unnecessary the use of chemical restraint, shackles, solitary confinement, locked wards, or prolonged isolation from one's normal community; and conditions of life which are normal enough to promote rather than detract from one's chances of living with fewer restrictions on one's movement."

*Mihalcik v. Lensink*, 732 F.Supp. 299, 303 (D.Conn.1990) (quoting *Thomas S. by Brooks, v. Flaherty*, 699 F.Supp. 1178, 1200–01 (W.D.N.C.1988), *aff'd*, 902 F.2d 250 (4th Cir.1990)) (emphasis in original). The First Circuit has applied the *Youngberg* test to involuntarily committed persons in general, rather than limiting *Youngberg* to mentally retarded persons. *See Doe*, 808 F.2d at 871.

■ Whether a patient's due process rights have been violated necessarily depends upon a weighing of his liberty interests against relevant state interests. *Id.* at 321, 102 S.Ct. at 2461. Accordingly, the *Youngberg* Court established a deferential standard, holding that "the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." *Id.* Thus the question is "not what treatment was actually provided, but whether the treatment decision was professionally made and falls within the scope of professional acceptability." *Woe v. Cuomo*, 729 F.2d 96, 105 (2nd Cir.), *cert. denied*, 469 U.S. 936, 105 S.Ct. 339, 83 L.Ed.2d 274 (1984). However, only decisions that are made by the "appropriate professional" are entitled to a presumption of correctness. *Youngberg*, 457 U.S. at 324, 102 S.Ct. at 2462.

■ In addition, under the eighth and fourteenth amendments a state may not show "deliberate indifference" to an inmate's mental health needs. *See Cortenes–Quinones v. Jimenz–Nettleship*, 842 F.2d 556, 558, 560 (1st Cir.), *cert. denied*, 488 U.S. 823, 109 S.Ct. 68, 102 L.Ed.2d 45 (1988). "The extension of the eighth amendment's protection from *physical* health needs ... to *mental* health needs is appropriate because, as courts have noted, there is '[n]o underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart.'" *Torraco v. Maloney*, 923 F.2d 231, 234 (1st Cir.1991) (emphasis in original). The deliberate indifference standard has been held to apply to pretrial detainees who have not been convicted and may not be punished. The jail officials "violate the due process rights of their detainees if they exhibit a deliberate indifference to the medical needs of the detainees that is tantamount to an intent to punish." *Danese v. Asman*, 875 F.2d 1239, 1243 (6th Cir.1989), *cert. denied*, 494 U.S. 1027, 110 S.Ct. 1473, 108 L.Ed.2d 610 (1990).

■ If Cameron can show that the Center was deliberately indifferent to his mental health needs while he was involuntarily committed for treatment—not punishment—then *a fortiori* he has shown that the Center violated the *Youngberg* standard. This is because persons "who have been involuntarily committed are entitled to more considerate treatment and condi-

tions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg*, 457 U.S. at 322, 102 S.Ct. at 2461. A state's decisions about the treatment of an involuntarily committed patient cannot be constitutionally sufficient if in making them the state has shown deliberate indifference to the patient's mental health needs.

Cameron argues that defendants are violating his constitutional rights because he is not receiving minimally adequate treatment at the Center. In particular, he contends that he cannot be treated at the Center because the confrontational and prison-like management of the Center harms his ability to respond to treatment and thus inhibits treatment. For the reasons explained below, I find that in certain instances the Center has failed to provide Cameron with the standard of treatment required by *Youngberg*. Moreover, I find that in certain areas the Center has even acted with deliberate indifference to Cameron's mental health needs.

### III. Defendants' Motion For Directed Verdict

At the close of the evidence defendants moved to dismiss the action pursuant to Fed.R.Civ.P. 52(c) on two grounds. First, defendants contend that this action must be dismissed because there is no constitutional right to psychological or psychiatric treatment under the fourteenth amendment. As support for this contention defendants cite *Knight v. Mills*, 836 F.2d 659 (1st Cir.1987). Second, defendants claim that Cameron's action is barred by *res judicata*. In particular, defendants contend that Cameron's claims were adjudicated in *Langton v. Johnston*, 928 F.2d 1206 (1st Cir.1991), and thus are barred.

### A. *Constitutional Right to Treatment*

■ Defendants contend that this action must be dismissed because Cameron does not have a constitutional right to treatment. This contention must be rejected. First, as I stated in Part II, *supra,* the Supreme Court has recognized that involuntarily committed patients do have a constitutional right to minimally adequate treatment based upon the exercise of professional judgment. *Youngberg*, 457 U.S.

at 322, 102 S.Ct. at 2461. Thus, although Cameron may not have a right to any particular treatment—including psychological treatment—he does have a right to treatment that is based, at a minimum, on the exercise of professional judgment.

Second, *Knight v. Mills*, 836 F.2d 659 (1st Cir.1987), does not support defendants' contention that there is no constitutional right to psychological or psychiatric treatment. In *Knight* a patient at the Treatment Center who, like Cameron, had been involuntarily committed for a period of one-day-to-life as a sexually dangerous person, sought damages from officials at the Center on the ground that they had violated his right to treatment as established in *Jackson v. Indiana*, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972). The court affirmed the district court's dismissal of the plaintiff's claim on the ground that "[t]he Supreme Court ... had not resolved the issue of a constitutional right to psychological treatment by 1981," and thus defendants were entitled to qualified immunity. *Knight*, 836 F.2d at 668. Thus, the court did not hold that there is no constitutional right to treatment.

■ Moreover, to the extent *Knight* can be read as holding that there is no constitutional right to psychological treatment *per se*, *Knight* did not hold that there is no right to minimally adequate treatment as defined in *Youngberg*. A patient may still be entitled to psychological treatment to the extent it is required by the professional judgment standard of *Youngberg*. Accordingly, *Knight* does not require this court to dismiss Cameron's claims.

### B. *Res Judicata*

■ Defendants next contend that Cameron's fourteenth amendment claim is barred by *res judicata*. In *Langton v. Johnson*, 928 F.2d 1206 (1st Cir.1991), patients at the Center sought to have the Commonwealth held in contempt for failing to comply with a consent decree governing conditions at the facility. In particular, the plaintiffs alleged that the Center failed to (1) provide treatment sufficient to bring about the patients' recovery; (2) administer

the treatment actually furnished in the least restrictive manner consistent with security needs; and (3) operate the Treatment Center as a mental health facility rather than as a penal institution. In upholding the district court's decision for defendants the First Circuit noted that a finding of compliance with the consent decree was also a finding of compliance with constitutional requirements. *Id.* at 1217. Thus, defendants contend that the First Circuit has already determined that Cameron's constitutional rights have not been violated.

Defendants' reliance on *Langton* is misplaced. Although Cameron was a member of the plaintiff class in that action, there was no adjudication of his individual claims. Rather, in *Langton* the court determined that in general the defendants were in substantial compliance with the consent decree. Moreover, Cameron's claim is that even assuming defendants are still in compliance with the consent decree, the defendants have violated his constitutional right to minimally adequate treatment by ignoring his individual treatment needs, and instead treating him in a manner that defendants know is harmful to him.

The *Langton* court did not even consider Cameron's individual claims. There was no evidence as to Cameron's diagnosis. There was no evidence as to his treatment needs. There was no evidence that the Center was exercising professional judgment in its treatment of Cameron. In other words, although the court found that the Center was in compliance with the consent decree in enacting certain security policies and regulations, there was no adjudication as to whether professional judgment was exercised in applying those policies and regulations to Cameron. Accordingly, defendants' motion to dismiss is denied.

### IV. Findings of Fact and Conclusions of Law

The evidence is uncontroverted that Cameron suffers from a borderline or mixed personality disorder and post-traumatic stress disorder. There is also no dispute that as a result of Cameron's psychological disorders he may often act in a paranoid and confrontational manner.

Michael Stevens is the assistant director of clinical programs at the Center and chairman of the Restrictive Integration Review Board ("RIRB"). The RIRB annually reviews the records of each patient, determines whether patients are still considered sexually dangerous, and recommends whether patients should participate in community access programs. Stevens testified that Cameron's pathology inhibits his ability to accept and remain in treatment. In his opinion, and in the opinion of the RIRB, Cameron needs to be treated based on a model that is nonchallenging and nonconfrontational.

In addition, Dr. Seghorn, an expert called by plaintiff, testified that any treatment program that emphasizes rigid compliance, submission, and passivity would be harmful to Cameron, and that because of Cameron's pathology he would be likely to overreact or misinterpret strict application of security rules. Gloria Berman, Cameron's therapist, testified that when Cameron feels threatened it causes him to go back to several traumatic events in his past, making it difficult to treat him. The evidence thus showed that a confrontational, rigid approach to treating and training Cameron would not be effective, but rather would be harmful to his mental, and even physical health.

Cameron contends that although defendants are aware of his diagnosis and treatment needs, defendants continue to treat him in the confrontational and rigid approach that the Center's mental health professionals warn is unacceptable, and that this treatment decision is not based on the exercise of professional judgment, but rather is based on the inflexible application of policies and regulations without any consideration for Cameron's mental health. In addition, he asserts that the Center's persistent refusal to treat him in a manner consistent with the nonconfrontational model recommended by the Center's mental health professionals rises to the level of "deliberate indifference" to his mental health needs.

Cameron has presented the court with several examples of defendants' alleged un-

constitutional actions. I will consider each example separately to determine whether Cameron has met his burden of showing that defendants have acted with "deliberate indifference" toward Cameron's mental health and/or have failed to exercise professional judgment in their treatment of Cameron.

### A. *Access to Outside Medical Care*

■ One of the main issues in this action is the defendants' refusal to permit Cameron to receive medical treatment from facilities other than the Center and its affiliated medical centers, except under rigidly restrictive conditions that are not supported by professional judgment. In December of 1987 Cameron contracted blood poisoning in his left foot. He was eventually taken to the Lemuel Shattuck Hospital ("Shattuck Hospital"). On March 7, 1988, Cameron lost the large toe on his left foot. He returned to the Center on April 25 of that same year. On July 12, 1989, Cameron's right leg became infected and he was again sent to Shattuck Hospital. His toes were amputated later that month. His condition did not improve and on August 15, 1989, his right leg above the knee was amputated. He was then returned to the Center's Hospital Services Unit where he remained at the time of trial.

In early 1990 and again in early 1991, Cameron applied to the Center's Authorized Absence or Community Access program. Under the program patients accompanied by civilian staff are permitted to receive medical care from facilities outside the Center. In both 1990 and 1991 Cameron's Community Access Review Team (CART) recommended Cameron's participation in the program. Gloria Berman, Cameron's therapist and the leader of the CART team, testified that she initiated Cameron's application for community access because he had serious medical needs that had to be addressed before she could make any progress with his psychological problems. These medical needs included possible treatment for suspected cancer, continued circulation problems, and a new prosthesis. Plaintiff's Exhibit 22. There was also testimony that because Cameron was wary of the Center's medical facilities due to his experience with losing his leg, he would not receive needed medical attention unless he was permitted to participate in the program.

None of the mental health professionals who evaluated Cameron's request for community access in either 1990 or 1991 felt that in receiving treatment through community access he would be a risk to the community. Both the 1990 and 1991 CART reports stated that community access would have high treatment value for Cameron and that he was not a risk to the community. In 1990 the CART report was unanimous. Plaintiff's Exhibit 14. In 1991 the only dissenting voice was that of an escort counselor. His report states that Cameron poses very little risk to the community but that Cameron has a real sense of entitlement that bothered him and thus Cameron should be denied community access. Plaintiff's Exhibit 22. The RIRB also recommended Cameron's participation in the plan in both 1990 and 1991. The Board consists of three outside consultants, one of whom must be an M.D. psychiatrist, two others who may be either clinical psychologists or psychiatrists, and two other members of the Treatment Center's clinical staff as well as the director of security for the Center. Michael Stevens, chairman of the RIRB, testified that the Board's recommendation was unanimous in both years.

The Administrator of the Center makes the final decision on whether a patient may participate in the program. In both 1990 and 1991 the Administrator refused to allow Cameron to participate in the program despite the strong recommendations of the RIRB and CART team. Dr. Jurgela and Michael Stevens testified that the only reason for the denial was that Center policy does not permit a patient to pursue his own medical treatment. This explanation is consistent with the memorandum that Ian Tink—the Administrator in 1990—wrote to Cameron to inform him that his application for community access had been denied. Defendants' Exhibit 118. First, the memorandum states that Cameron's "medical needs can best be addressed through the existing medical procedures at the Treatment Center." Second, the memorandum

states that he (Tink) could not ensure the safety of the public based on Cameron's treatment status. The memorandum did not explain how Tink came to this conclusion despite the unanimous conclusion of the RIRB and CART team that Cameron was not a risk. At trial Tink elaborated and stated that Cameron was a risk to the community because the Center's civilian staff is not well-trained in security issues and there was no way to ensure that when Cameron was on community access he would not have access to children. On his second day of testimony, Tink added that Cameron could become verbally assaultive.

Based on the foregoing, I find that the Center has violated Cameron's due process right to minimally adequate treatment aimed at reducing his time in restraint. The evidence was uncontroverted that Cameron's participation in the community access program would have high treatment value for Cameron's physical and mental health. In the opinion of all the mental health staff professionals who evaluated Cameron's request, Cameron had serious medical needs that needed to be addressed and could not be addressed if Cameron was not permitted to receive treatment from an outside facility. In these professionals' judgment, the only appropriate response to Cameron's refusal to receive medical care from the Center was to accommodate his request for outside treatment.

Defendants failed to provide any evidence that their decision to deny Cameron the treatment unanimously recommended by the Center's mental health professionals was professionally acceptable. First, although there was no dispute that Cameron's 1991 application for community access was denied, defendants did not offer any evidence as to who made the 1991 decision—let alone any evidence as to the reason for the decision. Thus, defendants utterly failed to show that the 1991 decision to treat Cameron's medical needs in a way other than that recommended by the RIRB and CART team was a decision based on the exercise of professional judgment.

Second, Ian Tink's explanation for his decision reveals his failure to exercise professional judgment. The exercise of professional judgment involves a weighing of the state's interests with the liberty interests of the patient. Tink did not engage in any such weighing when he applied the Center's medical treatment policy to Cameron without any consideration of the unanimous recommendation of all the mental health professionals who reviewed Cameron's request.

Tink's testimony that Cameron was a risk to the community because he would be near children in waiting rooms demonstrates a similar failure to exercise professional judgment. The presence of children may indeed be a concern for those patients at the Center who are pedophiles. However, defendants did not present a shred of evidence that Cameron is a threat to children. He has never been convicted or even suspected of abusing children. Thus the "risk" Tink allegedly based his decision upon lacks factual support. Moreover, the RIRB and CART team were all aware that Cameron can at times become verbally abusive, yet they did not find him to be a risk. Tink did not explain on what he based his opposite conclusion. The evidence supports the finding that rather than basing their decision to deny Cameron community access on the exercise of professional judgment, defendants were engaging in an unnecessary and harmful battle over control of Cameron's medical treatment.

Cameron also contends that Leonard Mach, the acting Administrator of the Center, is not qualified to make the final decision regarding Cameron's participation in the community access program. In *Youngberg* the Court explained that a professional decisionmaker is

> a person competent, whether by education, training or experience, to make the particular decision at issue. Long-term treatment decisions normally should be made by persons with degrees in medicine or nursing, or with appropriate training in such areas as psychology, physical therapy, or the care and training of the retarded.

*Youngberg*, 457 U.S. at 323 n. 30, 102 S.Ct. at 2462 n. 30. A decision about a patient's participation in a community access program for medical or psychological care is a

long-term treatment decision. Thus, if the Center's Administrator makes the final decision regarding community access, then "normally" the Administrator should be a person having a degree in medicine, nursing or psychology, or training in psychology, counseling, or the care and training of the sexually dangerous. Moreover, even if some basis for departure from the "norm" is shown, the Administrator is not free to act with disregard for the advice and judgment of appropriately qualified professionals.

These findings and conclusions support the judgment I reach in this case, and I explicitly do not make any finding about the qualifications of the Center's present Administrator, Leonard Mach, who did not testify at this trial and as to whose qualifications to be the final arbiter of Cameron's long-term treatment needs inadequate evidence was introduced at trial to support a finding.

### B. *Transportation Under Armed Guard and in Shackles*

■ The former Administrator Ian Tink further defended his decision to disregard the unanimous recommendation of the RIRB and Cameron's CART team on the ground that Cameron is allowed to go to appointments at the VA, as long as he is transported in the company of armed correctional officers. This explanation further reveals Tink's failure to give due attention to the professional judgment of his advisers.

First, as defendants brought to the attention of the court during cross-examination of Cameron, Cameron had to go to court to get a mandatory injunction ordering the Center to allow him to receive medical care from the Veterans Administration.

Second, under Tink's orders, Cameron was only allowed to go to the VA under armed guard and shackled with waist chains. Because Cameron only has one leg, and his prosthesis does not bend at the knee, he has to crawl into the prison van used to transport him. Gloria Berman testified that being shackled and transported in the prison van is harmful to Cameron's mental health because of his psychological problems, most particularly his post traumatic stress disorder. Both Gloria Berman and Dr. Jurgela had felt it important enough that Cameron be transported in a different way that they had offered to take him to his appointments themselves.

Bodily restraints are unconstitutional " 'except when and to the extent professional judgment deems this necessary to assure ... safety or to provide needed training.' " *Shaw by Shaw v. Strackhouse*, 920 F.2d 1135, 1142 (3d Cir.1990) (quoting *Youngberg*, 457 U.S. at 324, 102 S.Ct. at 2462). According to the uncontroverted evidence at trial, not only is transporting Cameron under armed guard and in shackles unnecessary—it is actually harmful to his treatment. The defendants, however, did not offer any testimony that could lead to the inference that in insisting that Cameron—an amputee—be transported in shackles in the company of armed correctional officers, defendants exercised professional judgment.

The only evidence offered by defendants was that patients have tried to escape in the past and that some patients at the Center are violent. It is undisputed in this case that there was no evidence that Cameron had ever been violent or physically assaultive since his incarceration, or that he had ever attempted to escape. *See Doe by Roe*, 617 F.Supp. at 1487 (finding that restraint of a patient was constitutional because the patient was and remains "an extremely assaultive, dangerous individual"). The use of bodily restraints must be professionally acceptable for the individual patient being restrained. Because defendants did not present any evidence that armed correctional officers and shackles are necessary for Cameron, I find that defendants violated Cameron's due process rights by insisting that he could receive outside medical care only if he was transported under armed guard and in waist shackles.

■ This finding, and the finding in Part III(A), do not require a conclusion that defendants must approve Cameron's participation in a particular program. However, if the Center ever does decide to restrict Cameron's liberty through shackles and

armed guard, or to deny him treatment that the Center's mental health professionals determine is appropriate, the decision must be supported by evidence that it is not being done as punishment, but rather as an exercise of professional judgment as to how Cameron can be treated in a way that is consistent with both his needs and the defendants' legitimate interests in security. Defendants have not presented any such evidence in this case.

## C. *The Maximum Privilege Unit*

■ The Treatment Center is divided into different living units with different levels of privilege, or, in other words, different levels of restrictions. There are maximum, moderate and minimum privilege units. Certain programs are available only to patients on certain units. For example, anger management therapy is available only to patients on the maximum privilege unit. Ever since Cameron returned to the Center in the fall of 1989 after losing his leg, he has been residing in the hospital unit. Gloria Berman testified that the hospital unit is more secure, and has fewer privileges, than the moderate privilege unit. In addition, there was testimony that, unlike the other units, there is no therapist assigned to the hospital unit. Moreover, although at one time a hospital unit patient was allowed to "satellite" to other units to participate in its programs, satelliting is no longer allowed.

Defendants do not contend that the hospital unit is a professionally acceptable placement for Cameron. Rather, defendants contend that Cameron, although invited, has refused to move to the maximum privilege unit. Thus, the argument goes, defendants cannot be unduly restricting Cameron's liberty if he refuses to avail himself of the maximum privilege unit. I find, however, that defendants have not made the maximum privilege unit available to Cameron.

First, defendants require Cameron to sign an application for the maximum privilege unit that provides that he agrees to be double-bunked if necessary. Cameron has steadfastly refused to agree to double bunking because of his handicapped condition. Ian Tink and Dr. Yuri Amit testified that the double bunking requirement is not enforced, and in any event is voluntary. Cameron, however, presented credible documentary evidence that in 1988 a patient was denied maximum privilege for the sole reason that the patient refused to agree to double bunk. Plaintiff's Exhibit 41. In addition, if not willfully confrontational, it is absurd for defendants to assert that double bunking is voluntary when they require, in order for a patient to be eligible for maximum privilege status, that the patient formally consent to double bunking, even though they themselves offer evidence that they have a policy and practice not to enforce the double-bunking condition. The application form for maximum privilege now in effect provides unequivocally that a patient must consent to doubling bunking. Plaintiff's Exhibit 40.

Second, in 1990, when Dr. Amit first invited Cameron to the maximum privilege unit, Cameron told Dr. Amit that his wheelchair would not fit in the room. Cameron then requested that the furniture be cut so that he could fit under the desk, have a closet, and move around with his wheelchair. Dr. Amit asked Cameron to give him a diagram of how the room should be designed and Cameron did so in late 1990. In addition, Cameron testified that he needs a hospital bed because of poor circulation in his leg. As of trial the Center had done nothing to comply, even partially, with Cameron's request to modify his room or to move a hospital bed into the room.

Dr. Amit's testimony makes it clear that defendants have not even made an attempt to determine if Cameron can function in the room with his wheelchair. Dr. Amit testified that the day before his testimony he was shown the room (apparently by a staff member) and was told that Cameron could not move around in his wheelchair, but that he (Amit) was unable to determine whether this was true because it was dark. Thus it appears that in the year since Dr. Amit had requested the proposed modifications from Cameron, up to the day before he testified, Dr. Amit had not attempted to determine what changes would be needed to make a room suitable for a patient in a wheelchair. Finally, no one at the Center has ever

brought Cameron to the room to actually determine whether he can function adequately in the room with his wheelchair.

Defendants presented no evidence of any medical, psychological, or even security reason for leaving Cameron in the high security, low privilege hospital unit where he has fewer opportunities for treatment, including no opportunity for anger management therapy, although both the RIRB and Dr. Jurgela have stated that anger management is a necessary component of Cameron's treatment plan. *See Clark v. Cohen*, 613 F.Supp. 684, 704 (E.D.Pa.1985) (holding that to be entitled to deference the treatment "decision has to be based on medical or psychological criteria and not on exigency, administrative convenience, or other non-medical criteria"), *aff'd*, 794 F.2d 79 (3d Cir.1986). I find that defendants have left Cameron in the hospital unit because they insist he consent to double bunking and because they refuse even to inquire about the need to make modifications to accommodate Cameron's disability.

Moreover, by leading Cameron to believe that he must sign a double bunking form, and by refusing to make any modifications to the room despite soliciting Cameron's suggestions over one year ago, defendants have treated Cameron in precisely the confrontational, nonresponsive manner that defendants know is harmful to Cameron's mental health. This kind of administrative action constitutes a failure to exercise professional judgment at best, and deliberate indifference to Cameron's mental health needs at worst.

### D. *Controlled Movement Regulations*

The Center maintains a "Controlled Movement Policy." The policy permits the patients to move around the Center for ten minutes at the beginning of certain hours of the day. The rest of the hour the patients must remain where they are, unless they have a special pass. In addition, they must sign out to where they are going and are strictly required to go to only that one place. If patients are discovered going somewhere other than to where they have signed out, or if they take more than ten minutes to get there, they are subject to discipline.

■ Cameron presented testimony that the movement control policy is not therapeutic for Cameron, or indeed for any of the patients. I cannot find, however, that by applying the movement control policy to Cameron the Center has been deliberately indifferent to Cameron's mental health or that the Center has failed to exercise professional judgment. Michael Stevens, for example, testified that there is some training value in requiring Cameron to comply with the policy. Thus, there was evidence that it is at least professionally acceptable to require Cameron to adhere to the regulations.

■ I do find, however, that in applying the ten minute restriction to Cameron without any consideration for his disability, defendants have failed to exercise professional judgment. Cameron testified that it is difficult for him to make it to his job answering the telephones on the second floor within the allotted ten minutes because he needs to go up stairs. In addition, he testified that he has difficulty dropping off books at the library and then making it to his assigned destination. This undue pressure upsets Cameron and compromises his treatment. Ian Tink, in response to a question from the court, testified that in developing the policy and the ten minute limitation, he and the others involved did not consider the distinctive needs of disabled patients. Thus it is clear that even if professional judgment was exercised in adopting the policy, there was no judgment made as to its appropriateness for a patient with Cameron's disability and pathology.

In response, Ian Tink testified that Cameron chooses to use the stairs rather than to use the elevator. Thus, Tink concluded, Cameron could easily get around in the allotted ten minutes if he was not so stubborn and would use the elevator. Tink's response was less than candid. At trial the next day the defendants' next witness, Dr. Amit, testified that in order to use an elevator a patient must find a sergeant—not just any correctional officer—with a key to the elevator who must then escort Cameron while he uses the elevator, because the elevator goes to unsecure as well as secure

floors. Dr. Amit's testimony made it perfectly clear why Cameron would choose to go up the stairs rather than take the elevator—he would seldom if ever be able to do all that is required to use an elevator in the allotted ten minutes.

Tink's response to the court about the elevator is disturbingly characteristic of the Center's response to Cameron. Rather than attempt to accommodate Cameron's mental and physical disabilities, the Center has taken an antagonistic attitude toward him—blaming everything on Cameron's stubbornness and declining to exercise the professional judgment that would require some flexibility in the application of the Center's rules and policies, even though the Center's mental health professionals have warned that such inflexibility is harmful to Cameron.

### E. *Strip Search Policy*

In 1986 Cameron refused to submit to a strip search after meeting with his attorney in the visiting room. As a result, an "extraction team" was immediately called to the scene. The team consists of eight correctional officers dressed in black uniforms and riot gear. The officers proceeded to handcuff Cameron and take him to sequestration where his clothing was forcibly removed and he was restrained while the officers conducted an anal cavity search.

The incident had a debilitating effect on Cameron. A behavioral observation report from a few days later stated that as a result of the incident Cameron's mood fluctuated from helplessness, anger, despair and hopelessness and that he should be continued to be monitored. Plaintiff's Exhibit 25. Cameron felt that he had been raped and even stated to Center staff that he now knew how his victims felt. Cameron is still subject to strip searches although it appears that the extraction team has not been used on him since the incident in 1986. Also, the policy under which attorney visits must be followed by strip searches is no longer in effect.

Cameron presented evidence that the use of the extraction team was unnecessary and compromised Cameron's treatment. Dr. Jurgela testified that in his professional judgment the appropriate way to proceed would have been to (1) wait for a bowel movement to see if Cameron was hiding anything or (2) call in a clinician to speak to Cameron and try to reason with him before immediately proceeding with the extraction team. Consultation with professional staff before proceeding with such a serious invasion of an involuntarily committed patient's liberty is a constitutional requirement. *See Doe*, 808 F.2d at 885 (noting that use of restraints on patients was constitutionally permissible because they were only used after approval by a member of the professional staff).

Defendants did not offer any evidence that proceeding with the extraction team without even consulting a clinician was a professionally acceptable decision. Although there was testimony as to the need in general to prevent patients from smuggling in contraband, there was no testimony that Cameron posed such a risk, especially after visiting with his attorney. In addition, there was no testimony that defendants could not apply the professionally acceptable approach suggested by Dr. Jurgela. It does not follow, of course, that Cameron cannot be strip searched. It does follow, however, that defendants failed to weigh its own security interests with Cameron's liberty interests, and thus to reach a professional judgment. Rather defendants blindly enforced a Center policy without any consideration, any judgment as to how it would affect Cameron, and whether defendants' needs—if indeed there were any needs—outweighed the known harmful effect on Cameron. Such a severe violation of Cameron's liberty, a person committed to the Center for treatment, not punishment, cannot pass constitutional muster.

### F. *Oral Cavity Search*

Defendants often subject Cameron to oral cavity searches after he takes his prescribed medication. Defendants presented evidence that the reason for this policy is that some patients have been known to hoard medicine and then trade it or sell it to other patients. There was also testimony, however, that subjecting Camer-

on to these intrusions is unnecessary, and greatly upsets him and inhibits his ability to be treated. There was no testimony that defendants took Cameron's mental health into consideration when subjecting him to these searches. There was no testimony that a mental health professional is ever consulted before a search is conducted. Indeed there was no testimony that any weighing of defendants' need to conduct the search with its effect on Cameron's mental health occurred. These searches are another example of defendants' rigorously applying bright-line security policies to Cameron without any consideration of a policy's effect on Cameron's mental health. Such a failure to exercise professional judgment violates Cameron's constitutional rights.

■■■ This is not to say that oral cavity searches are forbidden. It is to say that a professional judgment must be made as to whether they should be instituted against Cameron. It is not enough for defendants to say that some patients hoard medicine and therefore all patients will be subjected to this search, even if it is harmful to a patient's mental health, and even if there is little or no cause to believe a particular patient will hoard medicine. Before defendants may place this type of bodily restraint on Cameron, defendants must consult with the Center's mental health professionals to determine what is the professionally acceptable way to ensure defendants' legitimate interests consistent with Cameron's interest in freedom from unnecessary and harmful restraint.

### G. *The System of Discipline*

■■■ The Center monitors disciplinary violations through "Observation of Behavior Reports." These reports are written by members of the correctional staff when they observe an alleged disciplinary violation. After the report is filed, the patient may contest the findings of the report at a hearing. If the patient is found to be guilty of the reported action, the patient may be punished. For example, at one time Cameron was put on 30 days probation for having a metal filler in his pen when he was entering the visiting room. Plaintiff's Exhibit 22. In addition, if a patient has a grievance regarding the Center's policies and regulations, the patient is directed to fill out a Department of Correction grievance form. The mental health staff is not officially a part of the disciplinary system.

For most patients the Center's disciplinary system may indeed be reasonable and professionally acceptable. Defendants presented evidence that the system is needed to maintain safety, and that it provides patients with valuable training in learning to abide by rules. However, I find that even if this system is professionally acceptable for most patients, no professional judgment has been made as to whether it is acceptable for Cameron.

Cameron presented evidence that the confrontational and inflexible way in which alleged disciplinary violations are handled by the correctional personnel inhibits his ability to respond to treatment. Dr. Jurgela testified that when Cameron is confronted by the correctional officers his pathology causes him to become anxious and to want to escape. If he cannot escape, he responds with verbal outbursts. Cameron is often disciplined for showing disrespect to correctional personnel. Plaintiff's Exhibit 22. Michael Stevens testified that such discipline reflects a fundamental misunderstanding of Cameron's mental illness. He stated that punishing Cameron for his verbal outbursts is similar to punishing a person with Tourette's syndrome for swearing. In both cases the patient is being punished for the manifestation of psychological problems.

Defendants did not offer any evidence that it is professionally acceptable to have the Department of Correction responsible for the discipline and punishment of Cameron without any involvement of the Center's mental health staff. Rather, the only defense defendants offered is the general need to maintain safety and security at the Center. There is no doubt that defendants have a strong interest—indeed a constitutional duty—to maintain a safe and secure environment at the Center. However, defendants did not offer any evidence that they exercised professional judgment in ap-

plying the disciplinary policy developed for the patient population as a whole to Cameron.

Of course, not every incident in which defendants treat Cameron in a way that is harmful to his treatment rises to the level of a constitutional violation. "The line of demarkation between acts which violate due process and those which do not is whether the action taken was 'reasonable,' i.e., whether the decision was based upon the exercise of professional judgment." *Doe by Roe*, 617 F.Supp. at 1486. In this case defendants know that the strict enforcement of the Center's policies and regulations against Cameron by Department of Correction personnel is detrimental to Cameron's treatment. Yet defendants continue to discipline Cameron through this system without ever consulting the Center's clinicians on whether it is professionally acceptable to do so. Such treatment is not based on the exercise of professional judgment.

### H. *Visiting with the Grandchildren*

■ Cameron's attorney indicated at trial that defendants maintain a policy of refusing to allow the patients to visit with children in the Visiting Room. Thus, Cameron is not allowed to visit with his grandchildren. As defendants point out, because this information came from Cameron's attorney, and not from testimony or exhibits, it is not evidence, and I make no finding based upon it. I do observe, however, in the hope the observation may be useful guidance to the parties in the future, that if defendants do prohibit Cameron from visiting with his grandchildren at the Center they are clearly restricting his liberty. He is at the Center for treatment, not punishment, and defendants may not restrict Cameron's right to be a grandfather without a qualified professional deciding that it is professionally acceptable to do so. As I have already stated elsewhere in this Opinion, defendants may not justify such a restraint on the ground that some or even most of the patients are a risk to children. Rather, a qualified professional must make a determination as to Cameron's particular risk.

### I. *The Center's Ability to Treat Cameron*

■ At trial Cameron appeared to argue that the mere presence of the correctional staff at the Center hurt his ability to be treated. In addition, he presented evidence that the staff at the Center is in flux and that because he cannot be guaranteed that his therapist Gloria Berman will remain on the staff, he is unable to completely open up to her as is needed for him to be adequately treated.

I do not find that the mere presence of Department of Correction personnel prevents Cameron from receiving constitutionally adequate treatment. As has been stated, it is the strict and inflexible application of security rules without any professional judgment as to their effect on Cameron's mental health that has inhibited his ability to receive treatment. Nor do I find that the instability and general insufficiency of the staffing make it impossible for defendants to provide Cameron with adequate treatment. As was made clear at trial, Cameron is making some progress in his individual therapy with Ms. Berman, and individual therapy is the type of treatment that all professional opinions expressed at trial say is the most beneficial to Cameron.

■ It is true that the need for security measures at the Center makes it a less than ideal place for Cameron to receive treatment. And it may also be true that Cameron might be treated more quickly and effectively if he were placed in a mental health facility without the presence of Department of Correction personnel and with a more constant staff. However, an involuntarily committed patient does not have a constitutional right to an ideal environment. Rather, the Constitution requires a state to provide a patient with an environment in which professional judgment may be exercised. *See Doe*, 808 F.2d at 886. Although Cameron has proved that defendants have failed in many instances to exercise professional judgment, Cameron has not proved that the environment at the Center is such that professional judgment cannot be exercised.

## V. Relief

Having determined that defendants have violated, and in many instances, continue to violate Cameron's due process rights, I must determine what equitable relief is appropriate. As the Court made clear in *Youngberg*, it is not appropriate for this court to determine what treatment Cameron should receive. Rather, it is this court's duty to ensure that, however defendants choose to treat Cameron, the choice is based on the exercise of professional judgment—weighing the defendants' interest to protect others and Cameron along with Cameron's interest in minimally adequate treatment. In addition, however, when all the qualified professional opinion expressed to a court is that a patient should be treated in a certain manner, and defendants do not present a shred of evidence that it is professionally acceptable to treat a patient in a different manner, it is appropriate for a court to order the defendants to treat a patient in accordance with the professional judgment expressed at trial.

Based on the considerations explained above, the findings and conclusions stated in this Opinion, and the parties submissions regarding the form of judgment, I order the following relief:

1. The RIRB shall immediately review Cameron's commitment to the Center in order to determine the appropriate treatment and conditions of confinement for Cameron, as well as an evaluation of his current sexual dangerousness. As part of this review Cameron's community access requests shall be reconsidered. All final decisions on Cameron's long-term treatment, including his participation in the community access program, must be made by a qualified professional, or with due respect and regard for the judgment of a qualified professional.

2. Defendants shall allow Cameron to receive medical treatment from the Veterans Administration for the following: (1) a new prosthesis, (2) his circulation problems, and (3) possible treatment for suspected cancer.

3. Defendants shall refrain from transporting Cameron to and from his medical appointments by armed correctional officers and in shackles unless and until a qualified decisionmaker determines through the exercise of professional judgment that such restraints are professionally acceptable, based on a weighing of defendants' needs along with Cameron's treatment needs. Unless and until that judgment is made, defendants shall transport Cameron to his appointments without shackles and without an armed correctional officer.

4. If and when Cameron, or any member of the Center's clinical staff on Cameron's behalf, applies for further medical or psychological appointments outside of the Center, defendants must have a qualified decisionmaker consider those requests based upon the exercise of professional judgment.

5. Defendants are enjoined from enforcing the ten minute restriction in the Controlled Movement Policy against Cameron. Instead, defendants are ordered to consult with Cameron's therapist, other mental health professionals at the Center familiar with Cameron's pathology and treatment needs, and Cameron, to make a professional judgment as to what time limitations, if any, are appropriate for a patient with Cameron's disability and diagnosis.

6. Defendants are enjoined from using the "Extraction Team" against Cameron without first consulting with a Center clinician as to the professionally acceptable way to handle the situation.

7. Defendants are enjoined from enforcing the current disciplinary system, run by Department of Correction personnel, against Cameron. Instead, defendants are ordered to consult and confer with Cameron's treating clinician and other mental health professionals at the Center familiar with Cameron's treatment needs and diagnosis, to develop a system of discipline for Cameron that is based on a weighing of defendants' legitimate security interests, along with Cameron's liberty interest in not being treated in a manner that is harmful to his ability to respond to treatment.

8. Defendants are enjoined from conducting oral cavity searches on Cameron

unless and until a qualified decisionmaker determines, based upon the exercise of professional judgment, that such searches are necessary and acceptable for Cameron.

9. Cameron shall not be required to consent to double bunking to be eligible to reside on the maximum privilege unit.

10. A handicapped accessible room in a clinical housing unit at the Center shall immediately be modified to provide reasonable space for Cameron to use his wheelchair and walker. In determining what modifications are necessary, defendants, working with a Center clinician, shall obtain and consider Cameron's requests. In addition, defendants shall immediately consult with Cameron's treating physician at the Veterans Administration to determine whether Cameron needs a hospital bed. If a hospital bed is needed, defendants shall immediately make arrangements to provide Cameron with a hospital bed in the modified handicapped accessible room. Once the modifications are complete, the handicapped accessible room shall be made available to Cameron.