March 31, 1993 UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT
 

No. 92-1343

 ROBERT E. CAMERON,

 Plaintiff, Appellee,

 v.

 HENRY TOMES, ET AL.,

 Defendants, Appellants.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Robert E. Keeton, U.S. District Judge]
 

 

 Before

 Selya, Circuit Judge,
 
 Coffin, Senior Circuit Judge,
 
 and Boudin, Circuit Judge.
 

 

Elisabeth J. Medvedow, Assistant Attorney General, Commonwealth
 
of Massachusetts, with whom Scott Harshbarger, Attorney General,
 
Commonwealth of Massachusetts, was on brief for appellant.
David M. Rocchio with whom Robert D. Keefe, Mark G. Matuschak,
 
and Hale and Dorr were on brief for appellee.
 

 

 March 31, 1993
 

 BOUDIN, Circuit Judge. This case was brought by Robert
 

Cameron, who is currently detained in the Massachusetts

Treatment Center for the Sexually Dangerous ("the Treatment

Center"). The defendants, whom we refer to as "the state,"

are officials who are responsible for the Treatment Center.

In substance, Cameron complains that his conditions of

confinement violate the Due Process Clause of the Fourteenth

Amendment and his asserted constitutional "right to

treatment." 

 After a bench trial the district court granted

injunctive relief and the state appealed. We modify the

injunction in accordance with this opinion and, with certain

clarifications, otherwise affirm most of the relief ordered

by the district court. Our decision is based upon the

district court's findings but rests upon somewhat different

legal grounds.

 I. THE FACTS AND PRIOR PROCEEDINGS

 On December 13, 1978, Cameron was convicted in Vermont

of aggravated assault with a deadly weapon and sexual

assault--apparently attempted rape--and sentenced to a term

of six to twenty years. He was then extradited to

Massachusetts and convicted on September 12, 1979, for

assault with intent to rape, kidnapping, and other crimes,

and sentenced to a term of ten to twenty years, commencing

after the Vermont sentence. On being paroled by Vermont on

 -2-

July 12, 1982, Cameron began serving his Massachusetts

sentence, which at the time of trial was set to expire in the

year 2002.1

 After serving several years in a Massachusetts prison,

Cameron on November 14, 1985, was adjudged by the

Massachusetts Superior Court to be a sexually dangerous

person under M.G.L. c. 123A, and committed to the Treatment

Center for a period of one day to life. The occasion for the

commitment is not described. The Treatment Center, one of

several facilities located at MCI Bridgewater, has a

checkered history, much of it embroiled in litigation, e.g.,
 

Langton v. Johnston, 928 F.2d 1206 (1st Cir. 1991), and
 

M.G.L. c. 123A itself has an uncertain future.2 Most of the

Treatment Center's inhabitants have underlying criminal

convictions, and it is administered jointly by the

Departments of Mental Health and Corrections to address both

the medical and security aims of the Center. Cameron's stay

 

 1The district court opinion recites that the
Massachusetts sentence ended in February 1992; but the
parties advise us that Cameron's release date at the time of
trial was 2002. Cameron's brief says that this period may be
shortened by good time credits and possible parole.

 2The statute is one of the so-called sexual psychopath
laws enacted in the 1940s in a number of states. See C.
 
Tenney, Sex, Sanity and Stupidity in Massachusetts, 42 B.U.L.
 
Rev. 1 (1962). In 1990, the Massachusetts legislature
curtailed new admissions into the Treatment Center. See
 
Langton, 928 F.2d at 1209.
 

 -3-

at the Treatment Center appears to have been even more

unhappy than normal.

 Although the parties agree on little else, it appears

that Cameron who is 50 years old and a Vietnam veteran

suffers from severe psychological disorders. In the words of

the district court, "Cameron suffers from a borderline or

mixed personality disorder and post-traumatic stress

disorder. There is also no dispute that as a result . . . he

may often act in a paranoid and confrontational manner."

Cameron v. Tomes, 783 F. Supp. 1511, 1517 (D. Mass. 1992).
 

Psychological treatment is available at the Treatment Center-

-indeed, its availability is provided for under a consent

judgment entered many years ago3--but Cameron found what was

offered unsuitable until 1989 when he established a working

relationship with a therapist.

 In the meantime, Cameron brought the present suit in

1986 challenging his conditions of confinement. Counsel was

assigned, his claims evolved, and in December 1991 and

January 1992, the district court conducted a six-day bench

trial in the case. In his opinion issued on February 14,

1992, the district judge declared that Cameron had a

 

 3Regulations adopted pursuant to the decree provide that
"[e]very patient shall be offered treatment to effect his
early return to public society. Such treatment shall consist
of medical, psychiatric [and other services] . . . Such
treatment shall be administered . . . in the least
restrictive conditions which are consistent with [the
patient's] security needs." Langton, 928 F.2d at 1211.
 

 -4-

"constitutional right to minimally adequate treatment [for

his mental disorders] based upon the exercise of professional

judgment." 783 F. Supp. at 1516. The court rejected a

motion to dismiss by the state, which had argued that no such

constitutional right existed. Id. It also rejected the
 

state's res judicata defense, id. at 1516-17, based on the
 

Langton case where a different district judge had found that
 

the Treatment Center was in general compliance with the

consent decree. See Langton, 928 F.2d at 1208-16.
 

 The district court then ruled that, on a number of

issues, those in charge of the Treatment Center had made

judgments about Cameron and enforced policies against him

without, or contrary to, the advice of the medical

professionals involved in his treatment. 783 F. Supp. at

1518-25. The district court made specific findings relating

to Cameron's access to outside medical care, the use of

shackles and an armed guard in transporting him, his housing

in the facility, physical searches of him, and similar

matters. The court then granted injunctive relief on ten

different matters. Id. at 1526-27.
 

 First, and most broadly, the court ordered the pertinent

administrative board within the Treatment Center to conduct

an immediate review of his current sexual dangerousness,

appropriate treatment and conditions, and his request to

participate in what is called the community access program.

 -5-

783 F. Supp. at 1526. This injunctive provision ended by

stating: "All final decisions on Cameron's long-term

treatment, including his participation in the community

access program, must be made by a qualified professional, or

with due respect and regard for the judgment of a qualified

professional." Id.
 

 Several other decree provisions are similarly qualified.

The court suspended the use of shackles and an armed guard in

transporting Cameron for outside medical care unless and

until "a qualified decision maker determines through the

exercise of professional judgment that such restraints are

professionally acceptable, based on a weighing of [the

state's] needs along with Cameron's treatment needs." 783 F.

Supp. at 1526. Prohibited, under a similar condition, were

subjecting Cameron to a restrictive internal movement policy,

to an intrusive search procedure previously used and so-

called "oral cavity searches," and to the "current

disciplinary system" of the Treatment Center. Id. at 1526-
 

27.

 Finally, without any qualification as to professional

judgment, the court ordered that Cameron be allowed medical

treatment at Veterans Administration facilities for specific

medical conditions, that he be allowed housing in the maximum

privilege unit of the Treatment Center without consenting to

share a room, and that a handicapped accessible room be

 -6-

immediately made available to him. 783 F. Supp. at 1526.

This last direction, as well as several of the others, was

related to physical disabilities suffered by Cameron,

including the amputation of a leg due to infection while

Cameron was in the care of the state. 

 II. DISCUSSION

 Res Judicata. The state's threshold objection to the
 

suit is that Cameron's claims are encompassed by prior

litigation and are therefore barred as res judicata.
 

Emphasizing the "claim preclusion" branch of res judicata,
 

the state's brief says that one of the consolidated district

court cases embraced by Langton--Bruder v. Johnston--was a
 

class action suit concerning the right to treatment for all

persons confined at the Treatment Center as of 1987.

Cameron, says the state, was a member of the class and the

state prevailed in that case on the ground that treatment was

adequately provided.

 We agree with the district court that the state has made

no showing that Cameron's claim is barred by res judicata.
 

Cases on res judicata, ample in many areas, are fairly sparse
 

where preclusion of distinctive individual claims is urged

based upon an earlier class action judgment. But in Cooper
 

v. Federal Reserve Bank of Richmond, 467 U.S. 880 (1984), the
 

Supreme Court confirmed what common sense would suggest: a

class action judgment--there, in a discrimination case--binds

 -7-

the class members as to matters actually litigated but does

not resolve any claim based on individual circumstances that

was not addressed in the class action. Id. at 880-82.
 

 Under Cooper, we think that res judicata plainly does
 

not apply in this instance. The several law suits and years

of proceedings embraced by Langton require pages to describe,
 

but the suits were concerned with fairly general issues

(e.g., physical plant, sequestration, equality of treatment)
 

and with specific claims of individuals other than Cameron.4

The closest that that litigation came to this case was (1)

endorsement of a general requirement of treatment set forth

in state regulations, (2) rejection of a charge that the

authorized absence program was underutilized, and (3)

rejection of a general attack on the "double bunking"

requirement. These claims dealt with the general condition

of inhabitants of the Treatment Center. If Langton has
 

anything else in common with this case, the state has not

mentioned it.

 This case, by contrast, rests primarily on Cameron's

claims that his unusual situation requires special

accommodations: specifically, that his physical disability

affects his need for outside medical visits, freer movement

 

 4A detailed history of the litigation and the issues
decided is contained in the thorough, 171-page, unpublished
decision of Judge Mazzone, which this court in Langton
 
affirmed on all issues apart from attorney's fees.

 -8-

within the Treatment Center, and separate bunking

arrangements adapted to his handicap, and that his mental

condition (what lay people would probably call paranoia)

makes ordinary physical searches, disciplinary arrangements

and other constraints unsuitable, indeed psychologically

dangerous, for him. There is no suggestion by the state that

these issues peculiar to Cameron were actually litigated in

the Langton case.
 

 Thus, the state's claim reduces itself to the argument

that Cameron had to litigate those issues in the earlier
 

cases or forever hold his peace. To describe this claim is

to refute it: class action institutional litigation often

addresses general circumstances, not the distinctive plight

of someone claiming special needs or status. To the extent

individual concerns were addressed in Langton, Cameron is not
 

even mentioned in the district court decision. Nor could

earlier cases deal with later occurring events that are a
 

part of Cameron's present case. In theory, claim preclusion

is possible where an earlier class action claim is

essentially the same as a later action for individual relief,

and issue preclusion is possible where a fact resolved in the

class action proves important in the later action. See
 

Cooper, 467 U.S. at 880-82. No such overlap has been shown
 

here.

 -9-

 The Merits. The district court in this case premised
 

its decision on what it deemed to be two established

constitutional rights possessed by those at the Treatment

Center: "a constitutional right to minimally adequate

treatment [for mental disorders] based upon the exercise of

professional judgment," 783 F. Supp. at 1516, and a right to

be free from "[b]odily restraints" except "when and to the

extent professional judgment deems this necessary . . . ."

Id. at 1520. It is not entirely clear whose professional
 

judgment--medical or administrative--the district court had

in mind; but the implication of its discussion is that the

administrators of the facility are bound to listen to the

judgment of the medical professionals and to heed it unless

they offer good reason for refusing to do so. Id. at 1519-
 

20. 

 Both sides on this appeal seek a decision on the

constitutional "right to treatment," the state urging that

none exists and Cameron supporting the district court. In

our view, a decision on the abstract issue of "a right to

treatment" is not necessary for a disposition of this case;

and the concept has only a remote connection to the actual

relief sought. We address this point briefly, against the

background of prior "right to treatment" law, before

considering Cameron's own situation and the proper touchstone

for appraising his claims.

 -10-

 It is settled that those who are confined by the state,

for whatever reason, are entitled under the Constitution to

food, clothing, medical care, and reasonable efforts to

secure physical safety. Beyond such obvious essentials,

however, guidance from the Supreme Court is largely confined

to one cautiously phrased decision. In Youngberg v. Romeo,
 

457 U.S. 307 (1982), a mother, unable to care for her

retarded child, placed him in a state institution. Then,

discovering that he was sometimes physically restrained by

"soft" shackles and taught little in "basic self-care

skills," she sued. The Supreme Court held that under those

circumstances the child was constitutionally entitled to be

free from any but necessary restraints and had a right to

basic self-care training to secure safety and mobility. As

for deciding when and how much, the Court said that judges

should not dictate the choice among acceptable alternatives

and that a "presumption" of correctness must be attached to

"professional judgment." Id. at 321-23.
 

 Youngberg left in limbo a prior line of lower court
 

cases and academic literature that had sought to shape a

broad constitutional "right to treatment," including

treatment of the psychological ills of confined persons.5

 

 5See Stefan, Leaving Civil Rights to the "Experts": From
 
Deference to Abdication Under the Professional Judgment
 
Standard, 102 Yale L.J. 639, 686-90 (1992). Treatment, in
 
any curative sense, was not even an issue in Youngberg since
 
the retardation was not curable. The Court expressly

 -11-

Since Youngberg, a few circuits have ventured into this
 

constitutional territory, returning with different answers.6

We ourselves may have seemed to send mixed signals. In Doe
 

v. Gaughan, 808 F.2d 871 (1st Cir. 1986), this court, under
 

the caption "constitutional right to treatment," agreed that

Youngberg extended beyond the retarded to protect similar
 

interests of those mentally ill persons civilly committed to

a different Bridgewater facility. Id. at 884. In Langton,
 

four years later, this court explicitly refused to decide

whether there was a "constitutional right to treatment" at

the Treatment Center, remarking that "the trial judge's

skirting of the constitutional thicket was appropriate" as

such issues should be decided only when necessary. 928 F.2d

at 1217. One reason why it was unnecessary in Langton was
 

that the consent decree "set a higher standard than the

 

declined to devise any general rights to ameliorative
programs beyond basic self-help training to assure safety and
mobility, saying "we need go no further in this case." 457
U.S. at 319. 

 6Compare, e.g., Ohlinger v. Watson, 652 F.2d 775 (1980),
 
with Bailey v. Gardebring, 940 F.2d 1150 (8th Cir. 1991),
 
cert. denied, 112 S. Ct. 1516 (1992). See generally, Woe v.
 
Cuomo, 729 F.2d 96, 105 (2d Cir. 1984) ("The Supreme Court
 
has not directly addressed the question whether a
constitutional right to treatment exists . . . ."). 

 -12-

Constitution" in affording treatment for those in the

Treatment Center. Id.7 
 

 Although the parties seek to litigate the abstract issue

of a right to treatment, we prefer to plow a furrow no wider

than the case demands. Cameron's claims for the most part

are not really "right to treatment" claims at all: he is

receiving substantial psychological treatment for his

condition, and most of the arguments he is making concern

housing, mobility, transportation, and security. Further,

under existing state law, there is already a regulation-based

right to treatment at the Treatment Center that equals or

exceeds anything that the Supreme Court would likely impose

under the Due Process Clause. See Langton, 928 F.2d at 1217.
 

It is also unclear whether, if the Supreme Court did provide

a general "right to treatment" for civilly committed persons,

it would apply that right to those held as well under

criminal sentence. Youngberg, 457 U.S. at 321-22.8 At the
 

 

 7In Cortes-Quinones v. Jimenez-Nettleship, 842 F.2d 556
 
(1st Cir.), cert. denied, 488 U.S. 823 (1988), and Torraco v.
 
Maloney, 923 F.2d 231 (1st Cir. 1991), this court addressed
 
claims that authorities had not taken the precaution against
suicide of individual prisoners. While both decisions spoke
of the state's obligation to provide for medical needs, the
context was very far removed from any generalized right to
treatment for psychological conditions.

 8Whatever other significance it may have, we think that
Cameron's criminal sentence does refute any claim that he is
entitled under the Constitution to minimum physical restraint
based on the judgment of his doctors. Quite unlike the child
in Youngberg, Cameron is under criminal sentence of
 
imprisonment for serious and violent crimes. To that extent,

 -13-

very least, the Court's approach in Youngberg suggests hewing
 

to the case-by-case approach.

 Taking that approach here, we think the touchstone for

Cameron's claims is the Due Process Clause of the Fourteenth

Amendment, requiring conditions that do not fall below the

minimum standards of civilized decency. See generally Rochin
 

v. California, 342 U.S. 165 (1952). Under this rubric,
 

context works in Cameron's favor. While his prison sentence

will expire in 2002 or even earlier, his confinement in the

Treatment Center is from one day to life and will never end

unless his condition improves and he is found to be no longer

sexually dangerous. Thus, Cameron's best argument is that

the state's ordinary procedures and constraints are

affirmatively and needlessly worsening his mental condition,
 

so that he may well be confined long after his sentence has

expired. This is a claim with some bite, no matter how much

latitude states ordinarily have to run their institutions.

 Further, the findings of the district court, which

control unless clearly erroneous, Fed. R. Civ. P. 52(a); Doe
 

v. Gaughan, 808 F.2d at 877, lend support to Cameron's
 

argument. The findings amount to a determination by the

district court that procedures that might ordinarily be

applied--such as certain of the searches and the internal

 

he lacks the same "liberty" interest as the child in
Youngberg.
 

 -14-

movement controls--worsen Cameron's condition and may well be
 

unnecessary in this case. See 783 F. Supp. at 1523-25.9 On
 

both points, effect and necessity, the district court says

that this is the judgment of the medical professionals and

that no adequate response has been obtained from the

administrators. Id.
 

 The state broadly disputes this version of events,

pointing to other evidence showing how much it has helped

Cameron and tried to accommodate his special needs. It does

not, however, make much effort in its brief to rebut specific

findings as to specific episodes. We think there is some

conflict in the evidence but also that the district judge's

findings are not clearly erroneous. It is true that these

findings were made in the framework of a legal analysis that

we do not adopt, but the findings fit well enough into a due

process framework and this court may affirm on any grounds

supported by evidence. See Doe v. Anrig, 728 F.2d 30, 32
 

(1st Cir. 1984).

 

 9For example, the court invoked the testimony of
Cameron's therapist that the shackling was "harmful to
Cameron's mental health" and the court found it unnecessary
based on "uncontroverted evidence." 783 F. Supp. at 1520.
The court determined that the Treatment Center's internal
movement policy, allowing free movement for only 10 minutes
each hour, was unworkable for Cameron as an amputee, creating
"undue pressure [that] . . . compromises his treatment." Id.
 
at 1522. A forcible search of Cameron while handcuffed,
which the court found may well have been unnecessary, drove
Cameron into moods of "helplessness, anger, despair and
hopelessness . . . ." Id. at 1523.
 

 -15-

 Relief Ordered by the District Court. The immediate
 

relief ordered by the district court is, with one or two

exceptions, fairly modest, primarily requiring further

consideration of Cameron's case and some interim measures.

Importantly, the court has ordered a general reappraisal of

Cameron's treatment and conditions, with decisions to be made

by the administrators "with due respect and regard for the

judgment of a qualified professional." 783 F. Supp. at 1526.

But given the district court's use in several contexts of the

"professional judgment" standard, a word is in order for the

guidance of the parties and for any future litigation that

may ensue.

 In an institution like the Treatment Center, as in an

ordinary prison, security and administrative concerns may

clash with the welfare and comfort of individuals, as the

district court recognized. This was so in the facility at

issue in Youngberg, 457 U.S. at 320, and it is surely so in
 

the Treatment Center where most if not all those detained

have been convicted of crimes and many may be dangerous. Any

professional judgment that decides an issue involving
 

conditions of confinement must embrace security and

administration, and not merely medical judgments.

 Thus when it comes to appraising the judgments of the

administrators, it does not follow that they are bound to do

what the doctors say is best for Cameron even if the doctors

 -16-

are unanimous. The administrators are responsible to the

state and to the public for making professional judgments of

their own, encompassing institutional concerns as well as

individual welfare. Nothing in the Constitution mechanically

gives controlling weight to one set of professional

judgments. Indeed, when it comes to constitutional rights,

none of the professionals has the last word. Professional

judgment, as the Supreme Court has explained, creates only a

"presumption" of correctness; welcome or not, the final

responsibility belongs to the courts. See Youngberg, 457
 

U.S. at 323.

 With this clarification as to the role of "professional

judgment," we sustain the first injunctive relief provision

ordered by the district court directing the general

reappraisal of Cameron's personal dangerousness and of his

general conditions of confinement. Para. 1 (783 F. Supp. at

1526). The findings noted above and the evidence portrayed

in the district court's decision support this fairly modest

directive. In framing equitable relief, a district court has

substantial latitude, and we think its "remand" to the

Treatment Center administration is well within its authority.

 We also conclude that, on the same basis and with the

same clarification as to the role of professional judgment,

the district court's findings, see 783 F. Supp. at 1522-24,
 

support several other conditioned decree provisions: that

 -17-

administrators consider requests by Cameron for treatment

outside the Treatment Center, para. 4 (id. at 1526); that the
 

ten-minute movement restriction and oral-cavity searches be

suspended as to Cameron unless and until a qualified

decision-maker concludes that they are appropriate for

Cameron; and that the "Extraction Team" searches of Cameron

be barred unless there is prior consultation with a Treatment

Center clinician. Paras. 5, 6 and 8 (id. at 1526). 
 

 On two other decree provisions, we believe modifications

are required. First, the district court ordered that an

armed guard and shackles no longer be used when transporting

Cameron outside the facility unless and until a qualified

decision-maker determines this to be necessary. Para. 3 (783

F. Supp. at 1526). In matters of security, as opposed to

administrative convenience, the administrators' discretion is

at its zenith and Cameron is still under criminal

sentence.10 An armed guard and shackles may seem needless

precautions for an amputee, but we think that the Treatment

Center should not be obliged to suspend its specific security

measures for outside visits while Cameron's case is being

reexamined. If the district court wishes to require this

 

 10M.G.L. c. 123A, 6A, provides that, subject to
exceptions entrusted to an administrative board, "any person
committed as a sexually dangerous person . . . shall be held
in secure custody." Discharge from the Treatment Center does
not "terminate . . . any . . . unexpired sentence." Id. 9.
 

 -18-

armed-guard-and-shackles requirement to be re-examined on an

expedited basis, that is within its province.

 Second, we similarly modify the district court's general

injunction preventing the Treatment Center "from enforcing

the current disciplinary system, run by Department of

Correction personnel, against Cameron" until a new system

suitable to his needs is constructed. Para. 7 (783 F. Supp.

at 1526). We have no problem with the decree's requirements

that the administrators consider whether changes are

warranted in the current system as applied to Cameron and

that medical judgments be weighed in this process. But we

think that a generally phrased suspension of "the current

disciplinary system" in the meantime cuts too broadly and may

raise security issues as well.

 Finally, we sustain three unqualified decree provisions

made by the district court: that Cameron be allowed to

continue, as apparently he is at present, visits to Veterans

Administration facilities related to his amputation,

circulatory problems, and possible cancer; that the "consent"

to double bunking be waived as to Cameron, the "consent"

being largely symbolic; and that a handicapped accessible

room, including a hospital bed if necessary, be made

available to him. Paras. 2, 9, 10 (783 F. Supp. at 1526-27).

These specifics of relief lie largely within the judgment of

 -19-

the district court, and the state's brief makes no targeted

showing that these provisions are improper.

 III. CONCLUSION

 No one who reviews this record can dispute that Cameron

has done harm in the past, nor doubt that he has been

afflicted with serious mental illness. The findings of the

district court suggest that, without special attention to his

peculiar circumstances, further damage will be done to his

mental condition. We conclude that the state does have a Due

Process Clause obligation, to be balanced by it with

competing demands and interests, to seek to limit the extent

to which it worsens Cameron's condition and thereby extends

his detention indefinitely. Needless to say, there can be no

precision in such a Due Process Clause "standard" nor any way

to avoid further dispute about its application, if the

parties are bent on dispute. 

 The district judge, we think, had the right idea in

directing the Treatment Center to undertake a good faith

reappraisal of its policies as applied to Cameron. The more

swiftly the matter is returned to that forum, with that

perspective, the better off Cameron will be. As for the

state, it may regard the district judge's strictures on its

attitude as unfair and heedless of its past efforts for

Cameron. But the injunction, at least as we have adjusted it

and delimited its future effect, is not unduly burdensome.

 -20-

Like Cameron, the state has an evident interest in a

resolution that avoids further litigation.

 The district court's injunction is modified as set forth
 

above and is otherwise affirmed, with the clarifications and
 

upon the grounds stated in this opinion. No costs or

attorneys' fees shall be awarded in connection with this

appeal.

 It is so ordered.
 

 -21-